579 A.2d 1185

**GRUBB CONTRACTORS**

v.

**Donald W. ABBOTT, et ux.**

**No. 1811, Sept. Term, 1989.**

Court of Special Appeals of Maryland.

Sept. 28, 1990.

**386**

Paul J. Mraz, Elkton, for appellant.

David S. Sellman, Baltimore, for appellees.

Argued before WILNER, ROSALYN B. BELL and CATHELL, JJ.

ROSALYN B. BELL, Judge.

In this appeal, we define a single family dwelling as it appears in the mechanic's lien law, but only as it is used in that law. The appeal arises from the denial of a subcontractor's petition to establish a mechanic's lien for work done on the residence of Donald and Paola Abbott, appellees.

In September, 1987, the Abbotts contracted with John H. Matherly, designer/builder, to construct an addition to their home. The addition included a garage and several rooms that Mr. Abbott's mother was to use. The original agreement anticipated completion of the work in 45 days at a cost of $44,142.00.

Over the next several months, the Abbotts advanced $21,292.00 to Matherly for the purchase of materials and supplies. Matherly, however, had neither delivered supplies to the site nor begun work on the project. In fact, Mather-

ly signed another agreement with the Abbotts in July, 1988 to commence work and complete the project in 21 days. As part of the agreement, the contract was reduced $3,000 as compensation for Matherly's past delays.

Matherly then contracted with Grubb Contractors (Grubb), appellant herein, to commence construction of the addition. Kevin Grubb testified that Matherly "begged us to come down and do the job, to start the job, get him out of the hole...." Although Grubb had never worked on any other projects in Howard County, it agreed to perform the construction as a favor to Matherly.[1]

Grubb began construction on August 4, 1988 without requiring an advance payment from Matherly for labor and materials. On September 9, 1988, Grubb submitted a bill to Matherly for $2,329.66. Matherly did not pay the bill, telling Grubb that the Abbotts had no funds. Grubb did not question the Abbotts about Matherly's explanation. Grubb continued to work on the project and on October 25, 1988 presented another bill to Matherly for $11,611.62. This included the previous bill. Notwithstanding Matherly's failure to pay this bill, Grubb continued to accrue charges for work done on the project. On November 2, 1988, Grubb rendered a final bill to Matherly for $11,801.71. This was also never paid.[2]

Grubb told the Abbotts they would continue to work on the project but wanted the Abbotts to pay the $11,801.71 Matherly owed them before work would resume. The Abbotts, however, hired Natale Construction Co. to complete the job.

Grubb subsequently sent the Abbotts, by certified mail, a Notice of Intention to Claim a Lien within the required time limit under Md. Real Prop.Code Ann. § 9–104 (1974, 1988

---

1. Grubb Contractors is located in Cecil County and the travel time to and from the construction site was three hours. Because of the substantial daily travel, Grubb charged Matherly an additional labor charge of three hours per worker each day.

2. Mr. Abbott testified that Matherly "disappeared" in December, 1988.

Repl.Vol.). Mr. Abbott's mother received and accepted the notice on December 15, 1988. At trial, the court denied Grubb's petition to establish and enforce a mechanic's lien. From this ruling, Grubb appeals, contending:

—the trial court erred in denying its petition for a mechanic's lien since the Abbotts acted in bad faith; and

—the construction on the Abbotts' home was not construction on a single family home as required by the statute.

We affirm.

## BAD FAITH

Grubb first contends that the Abbotts acted in bad faith in permitting the subcontractor to perform services and provide materials on the project. Specifically, Grubb complains that since Matherly never delivered materials and supplies to the site and never performed any work, although the Abbotts had made advance payments of $21,292, the Abbotts knew or should have known before Grubb started to work on the project that Matherly had defrauded them. Grubb further alleges that the Abbotts were reckless and grossly negligent in making payments to Matherly and hence, acted in bad faith when they "sought restitution through the work of the unsuspecting Grubb, and they encouraged Grubb to do yet more work on the project knowing that Matherly would not pay [it]."

■ Upon our review of the record extract, we do not find, nor does Grubb direct us to, where this issue was presented for the trial judge's determination during the trial. The only indication that the issue was raised is in Grubb's Motion for New Trial and to Alter or Amend a Judgment. Moreover, the record shows that a hearing was held on this motion on August 4, 1989. Grubb, however, did not provide us with a transcript of those proceedings in its record extract. Since that hearing is the only place the

issue was ever discussed, that transcript is necessary for us to make a determination on the issue Grubb presents.

Rule 8–501(c) provides in pertinent part:

"The record extract shall contain all parts of the record that are reasonably necessary for the determination of the questions presented by the appeal. It shall include the judgment appealed from; the opinion or jury instructions of the trial court. . . ."

Rule 8–501(*l*) permits us to make any appropriate order with respect to the case as a sanction for noncompliance with Rule 8–501. Since the August 4, 1989 transcript was not provided, we need not reach the question of bad faith.

■ Even if we could reach this question, Grubb's contention is without merit. In support of its contention, Grubb relies on *J.L. Purcell, Inc. v. Libbey,* 111 Conn. 132, 149 A. 225 (1930). *Purcell,* however, is factually inapposite to the instant case. There, the trial court found that the owner knew and intended that no money would be available on the contract to pay the subcontractors. On one occasion, for example, the owner gave the contractors a check which was simultaneously endorsed back to the owner. The trial court concluded that the owner had acted fraudulently, and that the fraudulent representations of the contractor induced the subcontractor to furnish the material for which he filed his lien.

■ Here, the record—at least so much of it as we have—does not reveal any fraudulent behavior. Instead, the Abbotts attempted to ascertain whether the proceeds had been utilized for the purchase of materials and equipment. The Abbotts reasonably believed that the purchases were made because Matherly showed them copies of bills and cancelled checks for suppliers. Moreover, the owner does not bear the burden for negligent payment. Maryland Real Prop.Code Ann. § 9–114 (1974, 1988 Repl.Vol.) shifts the responsibility for insuring that subcontractors are paid from the owner to the prime contractor. *Ridge Sheet Metal Co. v. Morrell,* 69 Md.App. 364, 374, 517 A.2d 1133 (1986).

We therefore conclude that Grubb's first contention is without merit.

## SINGLE FAMILY DWELLING

Grubb next argues that Md.Real Prop.Code Ann. § 9–104(f)(3) (1974, 1988 Repl.Vol.) does not protect the Abbotts from attachment of a mechanic's lien. Section 9–104(f) provides:

"(3) Notwithstanding any other provision of this section to the contrary, the lien of the subcontractor against a single family dwelling being erected on the land of the owner for his own residence shall not exceed the amount by which the owner is indebted under the contract at the time the notice is given."

Grubb contends that the improvements done for the Abbotts consisted of an independent dwelling for Mr. Abbott's mother.[3]

The Abbotts, on the other hand, point out that the purpose of the work was to improve the property and make room for Mr. Abbott's mother at the residence. They argue that the addition of Mr. Abbott's mother as a resident does not disqualify the home as a single family dwelling since the use of the home is "solely for the use of the Abbotts' nuclear family and is not to be used by anyone other than the Abbott family."

The resolution of this dispute requires us to construe "single family dwelling" as used in § 9–104(f)(3). "Single family dwelling" is not defined in the mechanic's lien statute; nor did we find any cases in Maryland that define the term. We need, therefore, to ascertain the meaning the Legislature attached to that term as used in the statute.

In search of that meaning, we need to ferret out the " 'general purpose, aim or policy' " of the statute. *Kaczo-*

---

**3.** No issue was raised relative to the second requirement of the exception, namely, that the lien "not exceed the amount by which the owner is indebted under the contract at the time the notice is given."

*rowski v. City of Baltimore,* 309 Md. 505, 513, 525 A.2d 628 (1987) (citation omitted). When interpreting legislation, we look to the plain meaning of the words and, if clear, that generally completes our inquiry. The plain meaning rule, however, is not inflexible. As the Court of Appeals observed in *Tucker v. Fireman's Fund Insurance Co.,* 308 Md. 69, 75, 517 A.2d 730 (1986):

"We also recognize the rule that where a statute is plainly susceptible of more than one meaning and thus contains an ambiguity, courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment. In such circumstances, the court, in seeking to ascertain legislative intent, may consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense." (Citations omitted.)

Continuing its examination of the statute in question, the Court in *Kaczorowski,* 309 Md. at 514–15, 525 A.2d 730, explained:

"[T]he plain-meaning rule does not force us to read legislative provisions in rote fashion and in isolation. What we are engaged in is the divination of legislative purpose or goal. Indeed, as we have explained, the plain-meaning rule 'is not a complete, all-sufficient rule for ascertaining a legislative intention....' The 'meaning of the plainest language' is controlled by the context in which it appears. The aim or policy of the legislation, against which we measure the words used, is 'not drawn ... out of the air; it is evinced in the language of the statute as read in the light of other external manifestations of that purpose.' Or as Justice Holmes once put it, 'the general purpose is a more important aid to the meaning than any rule which grammar or formal logic may lay down.' More recently, the Supreme Court has stated the proposition thus:

'We agree ... that "[t]he starting point in every case involving construction of a statute is the language

itself." But ascertainment of the meaning apparent on the face of a single statute need not end the inquiry. This is because the plain-meaning rule is "rather an axiom of experience than a rule of law, and does not preclude consideration of persuasive evidence if it exists." The circumstances of the enactment of particular legislation may persuade a court that Congress did not intend words of common meaning to have this literal effect.'
*Watt v. Alaska,* 451 U.S. 259, 265–266, 101 S.Ct. 1673, 1677–78, 68 L.Ed.2d 80, 88 (1981) [citations and footnote omitted]." (Some citations omitted.) (Brackets in original.)

In *Ridge Sheet Metal Co. v. Morrell,* 69 Md.App. 364, 517 A.2d 1133 (1986), we had occasion to consider Md.Real Prop.Code Ann. § 9–104(f)(3) (1974, 1988 Repl.Vol.), but from the perspective of the amount of the indebtedness. In looking at the legislative intent, we stated:

"Turning to the legislative intent, we glean from the preamble to chapter 251 quoted previously that the Legislature intended in limited situations to shift the risk of loss from the owner of a single family dwelling to the subcontractor. The enactment of § 9–114 under chapter 251 in 1982 further evidences the Legislature's intent to ameliorate owner liability. This new section indicates that the burden for negligent paying will no longer be borne by the owner."
*Ridge Sheet Metal,* 69 Md.App. at 374, 517 A.2d 1133.

 We hold that in seeking to protect the owner of a single family dwelling the Legislature sought to protect the family by limiting the exposure of their residence to the potential liability of a mechanic's lien as opposed to protecting the commercial enterprise of multiple family dwellings. 35 C.J.S. *Family* p. 937 (1960) states:

"—In General. In its ordinary and primary sense the word 'family' signifies, embraces, or denotes a group of persons related to each other by marriage or blood, and

living together under a single roof, and comprising a household whose head is usually the father or husband; a collection of persons as a single group, with one head, living together, a unit of permanent and domestic character, under one roof." [4] (Footnotes omitted.)
This articulates the traditional family and it has never excluded aged parents, many of whom are dependent in some way—economic, physical or emotional—or can reasonably be expected to become so. The inclusion of Mr. Abbott's mother as a permanent resident does not make this two families, but a single family, with a single dwelling, and the Abbotts fall within the class of owners the statute sought to protect.

### —Separate Kitchen—

■ Appellant contends the addition is a separate dwelling and hence, does not qualify for the exemption. Appellant gets the most support for this position in the claim that there is a separate kitchen. There is considerable case law to support the position that, where an addition or a full floor of a dwelling consists of rooms for living, sleeping, bathroom and kitchen in both parts with a separate entry, the dwelling consists of two units. *City of Naples v. Clam Court Marina Trust,* 413 So.2d 475 (Fla.Dist.Ct.App.1982); *Williams v. Adami,* 70 Misc.2d 702, 334 N.Y.S.2d 539 (N.Y.Sup.Ct.1972); *Ostroff v. Sacks,* 64 A.D.2d 708, 407 N.Y.S.2d 546 (N.Y.Sup.Ct.1978); *Owens v. Michaelis,* 22 Misc.2d 107, 202 N.Y.S.2d 554 (N.Y.Sup.Ct.1960). We note in each of these cases, the facts indicate that a second separate kitchen was being added. More important, all these decisions construe local *zoning* ordinances which pro-

---

**4.** To like effect, see 35 C.J.S. *Exemptions* § 16 (1960):
"Under some statutes a debtor with a family may claim an exemption given 'for the use of a family,' or to 'a member of a family.' A 'family' is any collective body of persons who live together in one home, apart from a contract relationship, under conditions of a permanent and domestic character, and, according to some authority, under one head; but it is not essential that the group be dependent on the debtor for support."

vide definitions within the ordinance. Here, we must construe the State Mechanic's Lien Law which provides no definition.

There is case law to the contrary. In *Stafford v. Incorporated Village of Sands Point,* 200 Misc. 57, 102 N.Y. S.2d 910 (N.Y.Sup.Ct.1951), the Court held that a dwelling with two kitchens which housed the petitioner's family and his mother and sister was a single family use. In arriving at its decision, the Court used the definition of one family and two family dwellings as set forth in the Multiple Dwelling Law since no local ordinance defining those terms was available. Under the Multiple Dwelling Law, a single family private dwelling was defined as a building designed for and occupied by one family. *See also Baskin v. Zoning Board of Appeals of the Town of Ramapo,* 40 N.Y.2d 942, 390 N.Y.S.2d 412, 358 N.E.2d 1037 (1976), *reversing* 48 A.D.2d 667, 367 N.Y.S.2d 829 (N.Y.Sup.Ct.1975), where the Court of Appeals, without opinion, adopted the appellate division dissent that would permit the construction of a second kitchen in order for the petitioner's mother-in-law to have a Kosher kitchen in accordance with the tenets of the Orthodox Jewish faith.

The plans and contract in the instant case indicate that a small closet-sized space, opening onto the living room, was to be the site of a one-piece unit. The unit installed was approximately 26 inches by 6 feet,[5] and provided for the necessities of simple food preparation. To hold that the mere presence of this area in which Mr. Abbott's mother could store, prepare, cook and clean food constitutes a separate dwelling, when taken as a whole with the rest of the addition, would put form over substance. With the equipment available today, any small wet bar can, with no alteration, meet that function and potentially the definition appellant would have us adopt.

---

5. The plans identified this open closet as a wet bar and was a foot or so shorter than the unit actually ordered.

—Zoning Laws—

Grubb contends that to hold the Abbotts' home a single family dwelling would be to start down the slippery slope. We note the Zoning Regulations for Howard County. Section 103A.95. defines "Residence, Single Family" as "[a] building containing only one dwelling unit." A "Dwelling Unit" is defined as follows:

"One or more rooms in a residential building or in a structure, which are arranged, designed, used or intended for use by one family, for living and sleeping purposes, *and having only one kitchen or kitchenette.*" (Emphasis added.)

§ 103A.38. "Family" is further defined in § 103A.40. as:

"a. A single person occupying a dwelling and maintaining a household, or

"b. Two or more persons related by blood, marriage or adoption, occupying a dwelling, living together, and maintaining a common household, or

"c. Not more than eight unrelated persons occupying a dwelling, living together, and maintaining a common household."

Again, however, our decision is limited to the interpretation of single family dwelling as it is used in the State Mechanic's Lien Law and not the Howard County Zoning Ordinance. Appellees' problems, if any, with Howard County's zoning ordinance are not before us.[6] It does answer, at least in part, appellant's contention that to hold the Abbotts' dwelling to be that of a single family is a start down the slippery slope.

While we find no cases in Maryland that define the term "single family dwelling," we did find an acceptable definition from one of our sister jurisdictions that best articulates

---

6. The Uniform Residential Appraisal Report listed the zoning classification for the Abbotts' home as residential. We were not able to determine from the record the precise zoning. In addition, there is no evidence in the record regarding whether and what type of building permit was issued.

"single family dwelling." In *Brady v. Superior Court,* 200 Cal.App.2d 69, 19 Cal.Rptr. 242, 247 (Dist.Ct.App.1962), Justice Tobriner stated:

" 'Single family dwelling' designates the joint occupancy and use of the dwelling by all of those who live there. The word 'single' precludes the segregation of certain portions or rooms for rental. It forecloses *multiple* occupancy of certain portions of the unit for rental as a segregated part, or parts, of the unit. 'Dwelling' means the whole of the premises used for living purposes. It must include the use of the common rooms, such as the kitchen, dining room, living room, if any, by all occupants. It refers to, and reinforces, the concept of singular use, as opposed to multiple. The 'dwelling' cannot be fragmentized into broken bits of housing for rental return. 'Family' signifies living as a family; it inhibits the breaking up of the premises into segregated units. It does not necessarily compel the use of the unit by more than one person.... The word must then, instead, refer to the *use* of the premises as a family, or in the manner of a family. Such family use, again, would, and must be, a single and common use of the premises."

In applying this definition to the facts of the instant case, we do not find that definition inconsistent with a holding that the Abbotts' home, as improved, meets this definition of a "single family dwelling" for the purposes of the Mechanic's Lien Law.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.