762 A.2d 161

**RIDGE HEATING, AIR CONDITIONING
AND PLUMBING, INC.**

v.

**Robert S. BRENNEN, et ux.**

**No. 2763, Sept. Term, 1999.**

Court of Special Appeals of Maryland.

Nov. 13, 2000.

Anthony J. DiPaula (Covahey & Boozer, P.A., on the brief), Towson, for appellant.

J. Mitchell Kearney (Brown, Diffenderffer & Kearney, LLP, on the brief), Baltimore, for appellees.

Argued before DAVIS, THIEME and KENNEY, JJ.

DAVIS, Judge.

On September 30, 1998, appellant Ridge Heating, Air Conditioning and Plumbing, Inc. filed a two-count Complaint to Establish and Enforce a Mechanics' Lien against appellees Robert S. Brennen and Elizabeth P. Brennen in the Circuit Court for Baltimore County. On October 5, 1998, the circuit

court (Cadigan, J.) issued an Order to Show Cause to appellees inquiring why the lien in the amount claimed should not attach to appellees' property. Appellees filed a Verified Answer on October 22, 1998, denying liability on the grounds that they were not indebted to their general contractor, Timberwood Construction (Timberwood).

At the show cause hearing on November 12, 1998, the parties agreed, by Consent Order, that the matter should be set for trial in the normal course, pursuant to Maryland Rule 304(e)(2)(E), and that no final lien would be entered at that stage of the proceedings. Following discovery, appellees filed a Motion for Summary Judgment on May 9, 1999. Appellant filed its Answer and Memorandum in Opposition to Motion for Summary Judgment.

On December 29, 1999, the circuit court issued its Opinion and Order granting appellees' motion for summary judgment and entered judgment in favor of appellees and against appellant. Appellant filed this timely appeal, presenting one question, which we rephrase as follows:

Did the trial court err in applying Real Property § 9–104(f)(3) of the Maryland Annotated Code, limiting an owner's liability to a subcontractor who performs work on the owner's single family dwelling?

For the reasons set forth below we answer appellant's question in the negative and affirm the judgment of the trial court.

## FACTUAL BACKGROUND

In December 1997, appellant contracted with Timberwood to furnish and install heating and air conditioning systems and to furnish and perform requisite plumbing work, as part of the overall construction of an addition to appellees' residential home in Owings Mills, Maryland. The contract between Timberwood and appellees provided that Timberwood would complete the job by April 25, 1998 and that appellees would pay progress payments, as set forth in the contract, totaling $153,085.

Timberwood abandoned the project on August 3, 1998 because of financial difficulties, breaching its contract with appellees. Appellees incurred additional costs of $9,000 for a substitute contractor to complete the unfinished improvements to their home. Although appellant brought a lawsuit against Timberwood to collect on its outstanding invoices, appellant additionally sought to impose a mechanics' lien on appellees' home for the amount owed it under the Timberwood contract. Prior to contracting with Timberwood, appellant had at least eight other contracts with Timberwood and was aware of Timberwood's payment history. Appellant's records indicate that Timberwood had accounts payable to appellant of over ninety days past due.

The trial court found that Md.Code (1999 Repl.Vol., 1996 Supp.), Real Prop. (R.P.) § 9–104(f)(3) applies in this case, limiting the liability of appellees to the subcontractor. Additionally, the trial court found that there was no dispute as to any material fact and appellant failed to prove that appellees were indebted to Timberwood. Therefore, appellees were entitled to a grant of summary judgment.

## LEGAL ANALYSIS

█ Appellant contends that R.P. § 9–104(f)(3) should not apply in this case because the subsection applies only to new construction of single family dwellings, not to improvements, additions, or renovations of existing homes. Appellees contend that the legislature did not intend a narrow construction of R.P. § 9–104(f)(3) when it enacted the "residential exception" to mechanics' liens; rather, the statute applies to all homeowners and not solely homes being newly constructed.

Real Property § 9–104(f)(3) refers to the notice requirements that a subcontractor must provide when initiating a mechanics' lien on an owner's property:

(f) *Payments by owner to contractor after notice; limitation on lien against certain single family dwellings.*—

. . .

(3) Notwithstanding any other provision of this section to the contrary, the lien of the subcontractor against a single family dwelling being erected on the land of the owner for his own residence shall not exceed the amount by which the owner is indebted under the contract at the time the notice is given.

Appellant relies on R.P. § 9–102(a) for support of its contention that not all construction may be subject to a mechanics' lien:

Every building erected and every building repaired, rebuilt or improved to the extent of 15 percent of its value is subject to establishment of a lien in accordance with this subtitle for the payment of all debts, without regard to the amount, contracted for work done for or about the building and for materials furnished for or about the building, including. . . .

Because the legislature specifically included the distinction in R.P. § 9–102(a) between "every building erected" and "every building repaired, rebuilt or improved," appellant argues that the legislature would have included the same distinction in R.P. § 9–104(f)(3) if it had intended that improvements to existing homes were to be included in the residential exception. Instead, the language of R.P. § 9–104(f)(3) reads, "a single family dwelling being *erected* on the land of the owner for his [or her] own residence." (Emphasis added.) The section does not contain language regarding existing buildings to be "repaired, rebuilt or improved."

■ Although the mechanics' lien statute was enacted in 1976 to protect subcontractors and materialmen upon proof of performance and nonpayment, *see generally, Johnson v. Metcalfe,* 209 Md. 537, 543, 121 A.2d 825 (holding that a contractor may recover amounts due based on work performed); *Ridge Sheet Metal Co. v. Morrell,* 69 Md.App. 364, 369, 517 A.2d 1133 (1986), the law was amended in 1982 to "protect the owner of a single family dwelling" from liability. *Grubb v.*

*Abbott,* 84 Md.App. 384, 392, 579 A.2d 1185 (1990). As we noted in *Ridge,* the statute was enacted

> [f]or the purpose of limiting the liability of an owner to a subcontractor for work performed and materials rendered by the subcontractor on a single family dwelling erected on the owner's land for his [or her] own residence, to the extent that the owner has rendered payment to the [prime] contractor....

*Ridge,* 69 Md.App. at 370, 517 A.2d 1133 (citing 1982 Md. Laws 251, effective July 1, 1982).

Subsequently, in *Grubb,* we declined to accept a narrow definition of "single family dwelling." *See generally Grubb,* 84 Md.App. at 393, 579 A.2d 1185. At issue was whether a mechanics' lien could attach to a home when the owners were constructing a separate addition for use as an in-law apartment. *Id.* at 386, 579 A.2d 1185. In that case, the owners made clear that the purpose of the construction was to "improve the property and make room for [the owner's] mother at the residence." *Id.* at 390, 579 A.2d 1185. The prime contractor of the job contracted with Grubb Contractors to construct the addition onto the family home. *Id.* at 387, 579 A.2d 1185.

When the prime contractor failed to pay the subcontractor, Grubb sent the owners a notice of its intention to claim a mechanics' lien, pursuant to R.P. § 9–104. *Id.* Grubb's lien, however, was denied by the trial court and Grubb appealed, asserting that the residential exemption did not apply to owners who were not constructing a "single family dwelling." Grubb's contention was that the legislature's designation of "single family dwelling" within the statute did not contemplate the inclusion of an addition or "independent dwelling" added onto an owner's property. *Id.* at 390, 579 A.2d 1185. Grubb argued that, because the addition was a separate dwelling intended for someone other than an immediate family member, it could not qualify for the residential exception promulgated in R.P. § 9–104(f)(3). We disagreed, stating that

> in seeking to protect the owner of a single family dwelling the [l]egislature sought to protect the family by *limiting the*

*exposure of their residence to the potential liability of a mechanic's [sic] lien as opposed to protecting the commercial enterprise of multiple family dwellings.*

*Grubb,* 84 Md.App. at 392, 579 A.2d 1185. (emphasis added.)

Thus, we concluded in *Grubb* that the legislative intent behind the exception was to draw a distinction between commercial and residential structures.

Prior to *Grubb,* we had held that a subcontractor who had not been paid by the general contractor could not establish a mechanics' lien against the owner of a single family dwelling because the owner owed no payments to the prime contractor at the time the contractor pulled out of the job for financial reasons. *Ridge Sheet Metal Co.,* 69 Md.App. at 373, 517 A.2d 1133. The policy behind R.P. § 9–104(3)(f) was to shift the risk of loss from the owner of a single family dwelling to the subcontractor. *Id.* at 374, 517 A.2d 1133. In *Ridge,* concerning the legislative intent undergirding the statute, we explained:

Turning to the legislative intent, we glean from the preamble to chapter 251 quoted previously that *the Legislature intended in limited situations to shift the risk of loss from the owner of a single family dwelling to the subcontractor.* The enactment of [R.P.] § 9–114 under chapter 251 in 1982 further evidences the Legislature's intent to ameliorate owner liability. This new section indicates that the burden for negligent paying will no longer be borne by the owner. Section 9–114 states:

(a) At the time of settlement or payment in full between a contractor and an owner, the contractor shall give to the owner a signed release of lien from each material supplier and subcontractor who provided work or materials under the contract.

(b) An owner is not subject to a lien and is not otherwise liable for any work or materials included in the release under subsection (a) of this section.

> This provision shifts responsibility for insuring that subcontractors are paid away from the owner to the prime contractor.

*Id.* (emphasis added).

Addressing the subcontractor's argument as to fairness, we reasoned as follows:

> Appellant asserts that unless we determine that appellees are "indebted" and a lien can be established, the subcontractor is unprotected from the impecunious prime contractor who breaches and then otherwise uses the payment rather than paying the portion due over to the subcontractor. Were we to accept appellant's interpretation that an unenforceable obligation amounted to "indebtedness" under the contract, owners would still be liable to subcontractors despite the fact that they have paid over all monies they were obligated to pay under the contract, and despite the fact that the prime contractor could not go back against them for the retainage. This interpretation does not limit the owner's liability but instead extends it.
>
> Moreover, the subcontractor can best bear the risk of loss in this type of situation. One who is in the trade is clearly in a better position than an owner to know whether the contractor is in a financially unstable position. Late payments to other materialmen and rumors in the trade are better known to the subcontractor or are more easily discoverable by the subcontractor than the homeowner. Increasing the risk of double payment for the single family dwelling owner may well dampen the enthusiasm of the prospective house builder....

*Id.* at 374–75, 517 A.2d 1133.

In considering who is in the best position to avoid financial loss, we said:

> Additionally, the subcontractor can protect itself against loss very easily under the contract. The standard A.I.A. contract used in the case *sub judice* provided that the "[o]wner shall have the right to issue joint payee checks to Contractor and such other subcontractors or materialmen as

Owner may deem necessary in Owner's sole discretion." Appellant, if it anticipated trouble or suspected the contractor of financial instability or as a preventive measure, could have requested the owner to issue progress checks payable to both the prime contractor and to it for the work it did. Single family dwelling owners have little reason to object when a subcontractor requests that it be named as a joint payee for work done since such a request forestalls the possibility of a mechanic's [sic] lien levied against their property. *Thus, despite appellant's protestations, it is not necessarily unprotected from the impecunious contractor. Moreover, the unpaid subcontractor may always file suit against the prime contractor to recover monies due for work performed. Section 9–111, in force prior to 1982 and still in effect, contemplates such a situation by providing that*

> (n)othing in this subtitle affects the right of any person, to whom any debt is due for work done or material furnished, to maintain any personal action against the owner of the building or any other person liable for the debt.

Finally, contrary to appellant's characterization, appellees were not unjustly enriched based on the facts presented. It is appropriate to infer that appellees paid to the contractor in the last progress payment the amount allocable to appellant for the work it performed less 20 percent. Appellees would be required to pay twice for the work done should they have to pay appellant now or should a lien in the full amount be established.

. . .

In conclusion, we hold the owners were not indebted under the contract when the notice of intent to claim a lien was given, nor were they unjustly enriched. Hence, the subcontractor's lien must fail.

*Id.* at 375–77, 517 A.2d 1133 (emphasis added).

Similarly, the Court of Appeals held, in *Reisterstown Lumber Co. v. Tsao,* 319 Md. 623, 627, 574 A.2d 307 (1990), that,

although the mechanics' lien statute "should be liberally construed in favor of lien claimants," R.P. § 9–104(f)(3) was created as an exception to the statute. The *Reisterstown* Court held that the clear purpose of R.P. § 9–104(f)(3) was to protect the owner of a single family dwelling from double payment to the contractor and subcontractor. *Id.* at 628, 574 A.2d 307.

Speaking directly to the purpose of the exception in R.P. § 9–104, the Court of Appeals, in *Reisterstown,* explained:

But we are here concerned particularly with the residential exception which was added to the current statute by Ch. 251 of the Acts of 1982. *That exception's clear purpose is to protect from double payment the owner* of a "single family dwelling being erected on the owner's land for his own residence." . . .

That balance, per (f)(3), establishes the limit of the potential lien which can be imposed upon the property of the owner of a "residence." *The subcontractor's lien cannot exceed the amount due by the owner to the contractor. In that way the owner can be protected from double payment.* On receipt of the notice of intent to claim a lien the owner is entitled to withhold from future draw payments to the. contractor "the amount the owner ascertains to be due the subcontractor giving the notice." § 9–104(f)(1). If the subcontractor establishes a lien, the owner may take credit for the lien in resolving the account with the contractor. § 9–104(f)(2). The issue here is not how much the lien on the residence may be. Thus, the time of the notice as specified in § 9–104(f) is not controlling. . . .

The special rule applies only where the construction is "a single family *dwelling being erected on the owner's land for his own residence" could produce double payment on the part of the Tsaos.*

*Id.* at 628–31, 574 A.2d 307 (emphasis added).

Although appellant asserts in its brief that, "at no time has a Maryland appellate court been asked to determine whether R.P. § 9–104(f)(3) applies to home improvements," prior holdings of this Court and the Court of Appeals have consistently

construed the residential exception of R.P. § 9–104(f)(3) in the homeowner's favor. *See generally Reisterstown,* 319 Md. at 628, 574 A.2d 307; *Grubb,* 84 Md.App. at 392, 579 A.2d 1185; *Ridge,* 69 Md.App. at 375, 517 A.2d 1133. Appellant would have this Court interpret the statute as distinguishing between the construction of new homes and improvements made to existing homes. According to appellant, the statute's reference only to "single family dwelling being erected" should be interpreted as excluding repairs or improvements to existing homes. We are not persuaded by appellant's narrow interpretation of the statute or that the legislature intended a distinction between new construction of single family dwellings and improvements to single family dwellings.

Contrary to appellant's argument, the absence of any language in the statute regarding repairs or improvements does not countermand the policy concerns in protecting the homeowner. Our prior decisions have reiterated that the distinction the legislature made in enacting the residential exception was a distinction between commercial buildings and single family dwellings, rather than between newly built homes and existing homes. *See Grubb,* 84 Md.App. at 392, 579 A.2d 1185 ("... the [l]egislature sought to protect the family ... as opposed to protecting the commercial enterprise of multiple family dwellings."). *Grubb* is instructive in our decision, because there the owner was likewise building an improvement or addition to his existing family home. Our holding in *Grubb,* however, addressed whether the term "single family dwelling" would include the addition of an in-law apartment and if so, whether construction of a separate dwelling on the property was covered by the residential exception of R.P. § 9–104(f)(3). *See id.* at 390, 579 A.2d 1185. We determined that the "[owners'] home, as improved, meets [the] definition of a 'single family dwelling' for the purposes of the Mechanic's [sic] Lien Law." *Id.* at 396, 579 A.2d 1185. There simply is no plausible rationale to support a distinction between *Grubb,* which involved the improvement of a residence by the addition of an in-law apartment, and the instant case, which also involves an addition to the personal residence of appellees.

The minority's reliance on *Ridge Sheet Metal Co.* to support its argument that the original purpose of the mechanics' lien law was to protect subcontractors and materialmen is overridden by the policy considerations underlying R.P. § 9–104(f)(3) embraced in *Grubb*, which specifically dealt with the status of the statute as an exception to the mechanics' lien statute. *See Reisterstown Lumber*, 319 Md. at 627, 574 A.2d 307. In *Grubb*, we held that expanding a house by affixing an in-law apartment to it would fall under the exception to the mechanics' lien law; there is no reason to distinguish the construction of an addition that results in something other than an in-law apartment. As appellate decisions on this issue have evolved, the policies behind the statute have likewise emerged more definitively: (1) the protection of an owner of a single family dwelling from double payment to the primary and subcontractor; and (2) as this Court stated in *Grubb*, limiting the exposure of an owner's residence to the potential liability of a mechanics' lien *as opposed to protecting the commercial enterprise of multiple family dwellings.* The argument advanced by the minority narrowly interprets the phrase "single family dwelling being erected."

Since we recently have interpreted "single family dwelling" in *Grubb* to include construction of an in-law apartment and the Court of Appeals, in *Reisterstown*, has determined that one who later decides not to move into a home erected on his or her property is nevertheless covered, pellucidly, these decisions evince an interpretation of legislative intent that R.P. § 9–104(f)(3) is to be read as distinguishing between the homeowner and the commercial owner, as opposed to drawing a distinction between whether the single family dwelling is being "erected" or "remodeled." The exception to the mechanics' lien statute, in our view, was enacted to protect the *owner of a home*, regardless of the *kind* of construction conducted on his or her residence.

In the case *sub judice*, appellant was in a better position than appellees to know that Timberwood was in a financially unstable position. In fact, appellant knew. of Timberwood's payment history, in particular, as it had several prior con-

tracts with Timberwood. As we have noted previously, "the subcontractor can protect itself against loss very easily under the contract." *Ridge*, 69 Md.App. at 375, 517 A.2d 1133. Armed with appellant's knowledge of Timberwood's financial history, appellant could have protected its interest by requesting appellees to issue progress checks payable both to Timberwood and to appellant. Moreover, the Court of Appeals and this Court have consistently underscored that "the clear purpose" of the exception is to avoid double payment by the homeowner and to shift the risk of loss from the owner of a single family dwelling to the subcontractor. *Id.* at 374–75, 517 A.2d 1133.

In sum, it is more likely that "being erected on the land of the owner for his own residence" was language intended to make clear that R.P. § 9–104(f)(3) is inapplicable to agreements when someone other than the residential "owner," i.e., the commercial builder who contracts with the prime contractor, holds title to the land prior to placement of a lien against the property. To be sure, the lien, in legal contemplation, *is* against the "single family dwelling," notwithstanding that the claim is for labor or material involved in the rebuilding or improvement of existing structures. Clearly, the addition in this case was "on the land of the owner." As the minority points out, "Obviously, the legislature understands how to eliminate any linguistic distinctions between new and existing construction...." That being the case, divining an intent to distinguish between new construction and "erection" of an addition to an existing structure is less plausible than the difference between home improvements, remodeling, and repairs as contradistinguished from new construction and building on an addition. Significantly, the legislature could have expressly excluded additions "erected" or self-contained units added to existing improvements "erected on the land of the owner for his [or her] own residence" had that been the intent underlying the enactment of the legislation.

■ The stated purpose behind the 1982 amendment was to protect *the family* and limit exposure of personal residences as opposed to commercial enterprises, to avoid subjecting

*homeowners* to liability for double payment, and to shift the risk of loss from the homeowner to the subcontractor, who is in a better position to protect itself by requiring that the owner agree to authorize the progress draw payable to both prime and subcontractor. Additionally, as *Ridge Sheet Metal* points out, the subcontractor is more familiar with the general contractor's financial circumstances and better able to ascertain when financial collapse is imminent. To quote a maxim in equitable jurisprudence, "Whenever one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it." *Busey v. Reese,* 38 Md. 264 (1873).

The 1982 amendment and Maryland case law continue to pronounce the stated policy that subcontractors and materialmen be protected; however, the rationale that the homeowner must bear the loss when a general contractor becomes insolvent without paying his or her subcontractors because the homeowner received the benefits has been supplanted by the requirement that subcontractors, when providing labor or materials in residential construction, take simple precautions to protect their interest, the net result being that general contractors would not be able to "kite" their projects for extended periods and fewer subcontractors and owners would be left "holding the bag," because general contractors who are impecunious would simply fold. Finally, in *Ridge Sheet Metal,* we pointed out that R.P. § 9–104 did not affect the right to maintain a personal action against anyone, including the owner or the prime contractor, in which case, the claimant is put to its burden of proving the liability for the debt. The exception merely prohibits encumbrance of the residence with a mechanics' lien.

For the foregoing reasons, the language in R.P. § 9–104(f)(3) should not be narrowly construed so as to be inconsistent with the policy considerations behind the homeowner's exception. We, therefore, hold that appellant cannot establish a lien against appellees' single family home for the materials furnished and work performed and that the trial court did not

err in applying R.P. § 9–104(f)(3), limiting appellees' liability and denying appellant's petition for a mechanics' lien.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE COUNTY AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**

Dissenting Opinion by KENNEY, J.

KENNEY, Judge, dissenting.

This case involves the collision of competing policies within the mechanics' lien law that was adopted to protect those who furnish labor and materials in construction. *Riley v. Abrams,* 287 Md. 348, 357, 412 A.2d 996 (1980). In 1982, the legislature adopted Md.Code (1974, 1981 Repl.Vol., 1982 Supp.), § 9–104(f)(3) of the Real Property Article ("R.P."), which provided:

Notwithstanding any other provision of this section to the contrary, the lien of the subcontractor against *a single family dwelling being erected on the land of the owner for his own residence* shall not exceed the amount by which the owner is indebted under the contract at the time the notice is given. [Emphasis added.]

In *Reisterstown Lumber Co. v. Tsao,* 319 Md. 623, 628, 574 A.2d 307 (1990), the Court of Appeals recognized that the clear purpose of § 9–104(f)(3) is "to protect from double payment the owner of 'a single family dwelling being erected on the owner's land for his own residence.'" Real Property § 9–104(f)(3) has been liberally and, in my mind, appropriately construed by our courts to carry out the perceived legislative intent. This Court acknowledged, however, in *Ridge Sheet Metal Co. v. Morrell,* 69 Md.App. 364, 369, 517 A.2d 1133 (1986) that, although a significant change in the law occurred in 1982, the mechanics' lien statute is "still to be construed in favor of mechanics and suppliers."

In *Reisterstown,* the Court was confronted with owners who decided, after construction, not to occupy the dwelling because of its proximity and view of a cemetery. They decided ultimately to occupy the dwelling. The question before the Court

was whether the dwelling being erected was still being erected as their residence after they decided not to live in the house. Acknowledging that the problem presented was of limited scope, the Court in *Reisterstown* focused on the language "for his own residence" found in § 9–104 and held that whether the building is intended to be the owner's residence is determined as of the time when the subcontractor commences an otherwise substantially uninterrupted performance of work for, or sells materials to, the contractor. *Reisterstown,* 319 Md. at 630–31, 574 A.2d 307. *Reisterstown* involved new construction.

The majority finds *Grubb Contractors v. Abbott,* 84 Md.App. 384, 579 A.2d 1185 (1990), to be "instructive," majority opinion at 12, because it, too, involved an addition to an existing home, but that was not the issue decided in *Grubb.* The *Grubb* decision focused on what constitutes a "single family dwelling." The question presented was whether the inclusion of Mrs. Abbot's mother as a permanent resident of the dwelling with her own kitchen resulted in two families occupying the dwelling, rendering it no longer a single family dwelling. We concluded that the Abbott household remained "a single family, with a single dwelling." *Grubb,* 84 Md.App. at 393, 579 A.2d 1185.

*Grubb* looked to *Ridge Sheet Metal,* a case involving the issue of indebtedness, for guidance as to legislative intent. More recently, in *Best Drywall v. Berry,* 108 Md.App. 381, 395, 672 A.2d 116 (1996), we construed the term "residence" also to include a vacation home. Both *Ridge Sheet Metal* and *Best Drywall* involved new construction.

It appears that no case has decided directly the issue now before us: Is there a distinction to be made between new construction and remodeling or improving an existing dwelling in the application of § 9–104(f)(3)? As always, our goal is to determine the general purpose, aim, or policy of the statute, and, although we are not to be enslaved by the plain meaning rule, our starting point is always the language of the statute. *Tracey v. Tracey,* 328 Md. 380, 614 A.2d 590 (1992). In our analysis, it is important to examine the statute as a whole to

divine the legislative intent. *Hyle v. Motor Vehicle Admin.*, 348 Md. 143, 149, 702 A.2d 760, 763 (1997) ("In interpreting statute, Court of Appeals construes statute as a whole, interpreting each provision of statute in context of the entire statutory scheme.")

In reviewing the statute, I find the following provisions, as emphasized, instructive:

[Maryland Code Ann. (1974, 1996 Repl.Vol.)] § 9–102 Property subject to lien.

(a) *Buildings.—Every building erected and every building repaired, rebuilt, or improved* to the extent of 25 percent of its value is subject to establishment of a lien in accordance with this subtitle for the payment of all debts, without regard to the amount, contracted for work done for or about the building and for materials furnished for or about the building, including the drilling and installation of wells to supply water, the construction or installation of any swimming pool or fencing, the sodding, seeding or planting in or about the premises of any shrubs, trees, plants, flowers or nursery products, the grading, filling, landscaping, and paving of the premises, and the leasing of equipment, with or without an operator, for use for or about the building or premises.

\*      \*      \*

(c) *Machines, wharves, and bridges.—*Any machine, wharf, or bridge *erected, constructed, or repaired* within the State may be subjected to a lien in the same manner as a building is subjected to a lien in accordance with this subtitle.

(d) *Exemptions.—*However, a *building or the land on which the building is erected* may not be subjected to a lien under this subtitle if, prior to the establishment of a lien in accordance with this subtitle, legal title has been granted to a bona fide purchaser for value.

§ 9–104. Notice requirement for lien; form

(a) *Notice required to entitle subcontractor to lien.—*(1) A subcontractor doing work or furnishing materials or both

for or about a building other than *a single family dwelling being erected on the owner's land for his own residence* is not entitled to a lien under this subtitle unless, within 120 days after doing the work or furnishing the materials, the subcontractor gives written notice of an intention to claim a lien substantially in the form specified in subsection (b) of this section.

(2) A subcontractor doing work or furnishing materials or both *for or about a single family dwelling being erected on the owner's land for his own residence* is not entitled to a lien under this subtitle unless, within 120 days after doing work or furnishing materials for or about that single family dwelling, the subcontractor gives written notice of an intention to claim a lien in accordance with subsection (a)(1) of this section and the owner has not made full payment to the contractor prior to receiving the notice.

\*     \*     \*

(f)(3) Notwithstanding any other provision of this section to the contrary, the lien of the subcontractor against *a single family dwelling being erected on the land of the owner for his own residence* shall not exceed the amount by which the owner is indebted under the contract at the time the notice is given.

§ 9–113. Prohibited provisions in executory contracts.

(a) *In general.*—An executory contract between a contractor and any subcontractor that is *related to construction, alteration, or repair of a building, structure, or improvement* may not waive or require the subcontractor to waive the right to:

(1) Claim a mechanics' lien; or

(2) Sue on a contractor's bond.

(b) *Provisions conditioning payment to subcontractor on payment of contractor.*—A provision in an executory contract between a contractor and a subcontractor that is *related to construction, alteration, or repair of a building, structure, or improvement* and that conditions payment to the subcontractor on receipt by the contractor of payment

from the owner or any other third party may not abrogate or waive the right of the subcontractor to:

(1) Claim a mechanics' lien; or

(2) Sue on a contractor's bond.

(c) *Void provisions.*—Any provision of a contract made in violation of this section is void as against the public policy of this State.

In describing property that can be subjected to a lien, § 9–102(a) refers to "every building erected" and to "every building repaired, rebuilt or improved...." The value of the labor or materials is not an issue in the case of a "building erected." It is material to whether a lien will attach in the case of a repair, rebuilding or an improvement. Section 9–102(c), on the other hand, makes no distinction in the case of machines, wharves and bridges. Moreover, the exemption created by § 9–102(d) to protect bona fide purchasers for value also makes no distinction between new construction and existing buildings so long as the building is subject to a lien pursuant to § 9–102(a).

The language of § 9–104, the section in which the limitation under review is found, repeatedly carves out an exception between buildings generally and "a single family dwelling *being erected* on the owner's land for his own residence." (Emphasis added.) This language closely tracks the language of § 9–102(a) and implies, to me, that it applies to new construction. If the intent was not to limit § 9–104(f)(3) to new construction, there was no purpose to the words "being erected." Those words could be excised from the provision to protect generally the owners of single family residences similarly to the broad protection given to bona fide purchasers for value by the exemption in § 9–102(d). We are not to interpret a statute in a manner that would render a clause, sentence, or phrase "surplusage, superfluous, meaningless, or nugatory." *State v. Pagano,* 341 Md. 129, 134, 669 A.2d 1339 (1996) (quoting *Montgomery County v. Buckman,* 333 Md. 516, 524, 636 A.2d 448 (1994)).

Were we writing on a clean slate, I might agree that the policy interpretation reached by the majority is an appropriate policy. I find it difficult, however, to ignore the repeated language in this statute that reinforces a policy distinction between new construction and home improvements. Because we are being asked to interpret a limitation to a statute designed to protect lien claimants, which is to be interpreted in the most liberal and comprehensive manner in favor of mechanics, we should carefully heed our own admonition in *Ridge:*

> Since the law was designed to protect subcontractors and materialmen, the Court of Appeals repeatedly ruled that it was to be interpreted in the most liberal and comprehensive manner in favor of mechanics. Courts, however, had "no power to extend the law to cases, beyond the obvious designs and plain requirements of the statute." Although a significant change occurred in the law in 1982, as Chief Judge Gilbert recently repeated, it is still to be interpreted in favor of mechanics and suppliers.

*Ridge,* 69 Md.App. at 369–370, 517 A.2d 1133 (internal citations omitted).

In preceding cases, the statute could be construed without reference to language that distinguishes between buildings erected or "being erected" and an existing building being repaired, rebuilt, or improved. The language of § 9–104, both in the notice provisions, (a)(1) and (2) and in the limitation language of (f)(3), consistently refers to "a single family dwelling being erected on the owner's land for his own residence."

Obviously, the legislature understands how to eliminate any linguistic distinctions between new and existing construction, as demonstrated in § 9–102(c) ("any marine, wharf, or bridge erected, constructed or repaired") and § 9–113. Section 9–113 concerns contracts between contractors and subcontractors and refers to executory contracts "related to construction, alteration, or repair of a building, structure, or improvement." R.P. § 9–113(a) & (b). That language clearly encompasses

both new construction and home improvements. It is noted, also, that the prohibition created by § 9–113 against contracts waiving or requiring subcontractors to waive their right to a mechanics' lien or even to make the obligation of the contractor to the subcontractor conditioned upon payment by the owner to the contractor, reinforces a policy to protect subcontractors such as appellant in this case.

Are there possible reasons for such a distinction? One explanation is actually suggested by the Court in *Ridge.* In explaining why a person in the trades may be in a better position than an owner to know whether the general contractor is in a financially unstable position, the Court reflected that

> [i]ncreasing the risk of double payment for the single family dwelling owner may well dampen the enthusiasm of the *prospective house builder.* This in turn would further decrease *housing starts,* particularly in a slow market.

*Ridge,* 69 Md.App. at 375, 517 A.2d 1133 (emphasis supplied). The Court went on to note that "[f]or those unfamiliar with the housing industry, the number of *housing starts* is used as a predictor for market conditions for the coming year." *Ridge,* 69 Md.App. at 375, fn. 5, 517 A.2d 1133 (emphasis added). Rather than creating a protection for owners of existing homes, the legislation may have been designed to jump start or encourage new home construction in support of the housing industry. Perhaps, as a practical matter, the legislature believed that owners of existing homes, who are more likely to be on site during construction and who may have greater personal knowledge of the contractor being utilized, do not require the same protection as the new home buyer. In the end, of course, it may be simply a matter of legislative oversight or imprecise drafting. Obviously, we cannot know for sure, but I do not believe it to be necessary that we do.

I would interpret the limitation narrowly and, based on the language of the statute, find for the appellant. Therefore, I respectfully dissent.