517 A.2d 1133

**RIDGE SHEET METAL CO., INC.**

v.

**John B. MORRELL, et ux.**

No. 195, Sept. Term, 1986.

Court of Special Appeals of Maryland.

Dec. 4, 1986.

M. Stanley Radcliffe, Towson, for appellant.

John B. Morrell, Owings Mills, for appellees.

Argued before WILNER, BLOOM and ROSALYN B. BELL, JJ.

ROSALYN B. BELL, Judge.

Ridge Sheet Metal Company, Inc., a subcontractor, was denied a mechanic's lien for work done on a new residence of John and Lynn Morrell. Ridge appealed the denial of the lien.

The Morrells contracted with Hunter Associates, Inc., prime contractor, for the erection of a single family private residence on land that they owned. The full contract price was set at $125,000. The parties utilized a standard American Institute of Architects (A.I.A.) contract. Under that contract, periodic progress payments were to be made by the Morrells to Hunter based on applications for payment. The contract provided that 80 percent of the amount claimed and certified as work completed would be paid over to Hunter while a 20 percent balance would be retained. Article 6 of the contract defined final payment as the entire unpaid balance including the retainage and provided for this payment to be made when the work had been completed and the contract had been fully performed. Hunter began work on April 22, 1985, and the Morrells, by checks drawn by the lending bank payable to the owner and the contractor,[1] made periodic progress payments in accordance with the contract.

In response to an invitation to bid by Hunter, Ridge proposed to install a heat pump for $4,175. Approximately one-half of this amount was due on completion of the rough-in and duct work and the balance was due on completion of the job. The bid was accepted and a contract was entered into between Ridge and Hunter on June 17, 1985.

---

1. Of the four progress checks, three were made payable to John Morrell and Hunter, and one was made payable to John and Lynn Morrell. All four were endorsed to Hunter Associates, Inc.

The rough-in and duct work was completed and on June 28, 1985, Ridge billed Hunter $2,085 for the first payment under the contract.

On July 26, the Morrells made the scheduled progress payment to Hunter. By the latter date, Hunter had been paid 80 percent of the amount applied for, or $74,659.13. The Morrells, through the lending bank, held $18,664.78 as retainage.

Hunter experienced financial difficulties and ceased work shortly after receiving the last progress payment. It had not paid Ridge the $2,085 to which Ridge was entitled. As a result, the Morrells received from Ridge on August 22 a Notice to Owner or Owner's Agent of Intention to Claim a Lien. Thereafter, Ridge filed a Petition to Establish Mechanic's Lien. The Morrells refused to pay Ridge.

At trial, to establish it qualified for a lien, Ridge offered testimony through its vice president that it had performed the rough-in and duct work in accordance with the contract.[2] The date of the last work by Ridge was July 17. The vice president also stated that Ridge had not received any money from Hunter or the Morrells for that work.

The Morrells opposed the establishment of a mechanic's lien arguing that they had already paid Hunter all that they were required to pay, that the contract was never completed and thus they were entitled to keep the retainage. John Morrell admitted that the work the prime contractor performed was substantially in keeping with the payment applications and that before endorsing progress checks to the prime contractor, he went to the job site to confirm that the work had been done.[3] Twenty percent of the progress

---

**2.** There was no testimony that the work was other than satisfactory. In fact, the Morrells discussed with Ridge the completion of the second phase which was the installation of the heating and air conditioning. Ridge declined to perform further since it had not been paid for the first phase of the work.

**3.** Although the contract stated that an architect would certify that the work was completed, there was no architect involved at this stage of

payments was held back and all billings had been paid.[4] The president of Hunter, James Hunter III, corroborated Morrell's statement that Hunter had received all four progress payments and that 20 percent was held back as retainage.

The Morrells introduced into evidence two letters from James Hunter addressed to them. One letter was dated August 11, 1985 which authorized the Morrells to employ another contractor and expressed apologies for not completing the work. The second letter dated September 11, 1985 stated that "John Morrell owes Hunter Assoc. no money...." Hunter conceded at trial that this was true despite the 20 percent outstanding retainage.

At the conclusion, the court denied the lien, ruling that the Morrells owed no money to Hunter and, even though they held the retainage, they were not indebted under the contract as required under the mechanic's lien statute to establish a lien.

On appeal Ridge argues two points in challenging the denial of the lien:

"1. Should the retainage held by Appellees be considered in determining whether full payment has been made at the time the Notice of Intention to Claim a Lien is received?

"2. Should the retainage held by Appellees be considered in determining whether Appellees are indebted under the contract?"

Preliminarily we will set out the previous and current statutory framework for mechanic's liens as applicable to this situation.

---

the contract. Certification for the work completed was done by the Morrells.

**4.** Although it is not clear, it appears that the bills sent to the Morrells had already deducted 20 percent retainage from the total amount due.

## STATUTORY FRAMEWORK

Prior to 1982, the purpose behind the mechanic's lien law was clear. The mechanic's lien law, codified at Md. Real Prop. Code Ann., § 9–101 et seq. (1974, 1981 Repl. Vol.) was enacted to protect subcontractors (mechanics) and materialmen. *Reisterstown Lumber Co. v. Reeder*, 224 Md. 499, 507, 168 A.2d 385 (1961). In general, the law was "designed to encourage construction by ensuring that those who contribute[d] to a project [were] compensated for their efforts." *Barry Properties, Inc. v. The Fick Bros. Roofing Co.*, 277 Md. 15, 18, 353 A.2d 222 (1976). Specifically, the law sought to "protect materialmen who are not in a position to protect themselves if the owner negligently pays the [prime] contractor without first ascertaining that the materialmen have been paid." *Dickerson Lumber Co., Inc. v. Herson*, 230 Md. 487, 491, 187 A.2d 689 (1963). The theory behind the law was that because the owner reaped the benefit of the materials and had ultimate control of the funds, the owner should serve as a second source of payment if the owner negligently paid out money to the prime contractor. *Hill v. Parkway Industrial Center*, 49 Md. App. 676, 678, 435 A.2d 472 (1981), *cert. denied*, 292 Md. 376 (1982); *Bounds v. Nuttle*, 181 Md. 400, 406, 30 A.2d 263 (1943).

■ Since the law was designed to protect subcontractors and materialmen, the Court of Appeals repeatedly ruled that it was to be interpreted in the most liberal and comprehensive manner in favor of mechanics. *E.g., T. Dan Kolker, Inc. v. Shure*, 209 Md. 290, 296, 121 A.2d 223 (1956). Courts, however, had "no power to extend the law to cases, beyond the obvious designs and plain requirements of the statute." *Freeform Pools, Inc. v. Strawbridge Home for Boys, Inc.*, 228 Md. 297, 301, 179 A.2d 683 (1962). Although a significant change occurred in the law in 1982, as Chief Judge Gilbert recently repeated, it is still to be interpreted in favor of mechanics and suppliers. *Cabana, Inc. v.*

*Eastern Air Control, Inc.,* 61 Md.App. 609, 619, 487 A.2d 1209, *cert. denied,* 302 Md. 680, 490 A.2d 718 (1985).

The law was amended in 1982, obstensibly to affect the liability of a homeowner to a subcontractor who performed work on a personal residence. Chapter 251 of the Laws of Maryland 1982, effective July 1, 1982, was enacted "[f]or the purpose of limiting the liability of an owner to a subcontractor for work performed and materials rendered by the subcontractor on a single family dwelling erected on the owner's land for his own residence, to the extent that the owner has rendered payment to the [prime] contractor...." Prior to the amendments in chapter 251, the mechanic's lien law codified at § 9–104(a) provided in pertinent part:

"**(a) Notice required to entitle subcontractor to lien.** —A subcontractor is not entitled to a lien under this subtitle unless, within 90 days after doing the work or furnishing the materials, he gives written notice of his intention to claim a lien...."

Chapter 251 added an important provision to § 9–104(a). Section (a)(2) now states that a subcontractor who performs work on a single family residence is not entitled to a lien unless the subcontractor gives proper notice within 90 days and "the owner *has not made full payment* to the contractor prior to receiving" notice of the subcontractor's intent to claim a lien. Md.Real Prop.Code Ann. § 9–104(a)(2) (1974, 1981 Repl.Vol., 1986 Cum.Supp.). (Emphasis supplied.)

Prior to the amendment of the law in 1982, section (f) of § 9–104 stated:

"**(f) Payments by owner to contractor after notice.** —On receipt of notice [of intent to claim lien] given under this section, the owner may withhold, from sums due the contractor, the amount the owner ascertains to be due the subcontractor giving the notice. If the subcontractor giving notice establishes a lien in accordance with this subtitle, the contractor shall receive only the difference

between the amount due him and that due the subcontractor giving the notice."

The law now specifies at § 9–104(f)(3):

"(3) Notwithstanding any other provision of this section to the contrary, the lien of the subcontractor against a single family dwelling being erected on the land of the owner for his own residence *shall not exceed the amount by which the owner is indebted under the contract* at the time the notice is given."   (Emphasis supplied.)

These new provisions and the effect of these additions on owner liability to a subcontractor when a prime contractor breaches the contract with the owner have yet to be construed.

### "INDEBTED" UNDER THE CONTRACT

Appellant latches onto the phrases "full payment" in § (a)(2) and "indebted under the contract" in § (f)(3) and suggests that the use of the varying language implicates two different meanings.   Appellant posits that § (a)(2) was enacted to cover the situation where the prime contractor fully performed under the contract and the owner paid out all monies due, i.e., the full contract price.   In such a case, since "full payment to the contractor" had been made by the owner prior to receiving the subcontractor's lien notice, the owner is not liable to the subcontractor for a mechanic's lien.   Conversely, the provision in § (f)(3), appellant continues, covers the situation where the prime contractor has breached the contract through work stoppage prior to completion of construction and prior to paying subcontractors. In that case, while the owner is not liable to the contractor to make "full payment," the owner would still be "indebted under the contract" and thus liable to the subcontractor. Appellant asserts that the situation in the case *sub judice* falls under § (f)(3) and, taking the retainage into consideration, appellees are still "indebted under the contract."

■ Appellees argue that regardless of the appropriate application of § (a)(2), § (f)(3) overrides this provision be-

cause it clearly states that it is in effect "[n]otwithstanding any other provision of this section to the contrary." We agree with appellees.

We need not decide what "full payment" means under § (a)(2) because § (f)(3) must be met regardless of the meaning of any other provision. We turn then to § (f)(3).

As stated, § (f)(3) provides that a subcontractor may establish a lien only up to the amount the homeowner is "indebted under the contract." Appellant argues that appellees are still indebted in the form of the retainage representing 20 percent of the funds earned for work performed. The question now remains what the term "indebted" means.

Ballentine's Law Dictionary 606 (3d ed. 1969) defines "indebted" as follows:

> "Obligated to make a payment for money, property, or services. Obligated upon a debt, although not necessarily a debt due."

Thus, using the plain and ordinary import of the word "indebted," appellant can only establish a mechanic's lien up to the amount appellees are obligated under the contract to pay to the contractor. While appellees may be obligated under the contract for the retainage, that obligation is simply not enforceable. Are they still, then, indebted?

In discussing various definitions of the term indebted, 42 C.J.S. *Indebted* (1944) notes that the word "has not acquired a technical signification." *C.f. Wilson v. Wilson*, 8 Gill 192, 194 (1849). Citing *Wilson*, 8 Gill at 194, the editors instruct that "in construing the word, the whole context must be looked to to interpret its meaning." In examining the whole context, we hold that under § (f)(3), a subcontractor may only establish a lien up to the amount of an enforceable obligation of the owner to the prime contractor. Specifically, in the case *sub judice*, appellant may only establish a lien for all or part of the $2,085 if Hunter could legally enforce that obligation against appellees. This holding is based on the language of the contract, the legislative

intent behind the applicable statutory provisions, and manifest fairness.

## —Contract Language—

Article 6 of the contract defined what constituted final payment:

> "Final payment, constituting the entire unpaid balance of the Contract Sum, shall be paid by the Owner to the Contractor when the Work has been completed, the Contract fully performed, and a final Certificate for Payment has been issued by the Architect."

Article 9.9.2 of the General Conditions of the Contract for Construction stated when that payment was due:

> *"Neither the final payment nor the remaining retained percentage shall become due until* the Contractor submits to the Architect (1) an affidavit that all payrolls, bills for materials and equipment, and other indebtedness connected with the Work for which the Owner or his property might in any way be responsible, have been paid or otherwise satisfied, (2) consent of surety, if any, to final payment and (3), if required by the Owner, other data establishing payment or satisfaction of all such obligations, such as receipts, releases and waivers of liens arising out of the Contract, to the extent and in such form as may be designated by the Owner." (Emphasis supplied.)

In the case *sub judice,* appellees paid the prime contractor for 80 percent of the work completed as provided by the contract. They paid those amounts due periodically until the time the prime contractor breached. Final payment, including the retainage as part of the contract balance, however, was never due the prime contractor. Hunter simply could not enforce any obligation for retainage under the contract. Thus, appellees were not indebted under the language of the contract.

### —Legislative Intent—

Turning to the legislative intent, we glean from the preamble to chapter 251 quoted previously that the Legislature intended in limited situations to shift the risk of loss from the owner of a single family dwelling to the subcontractor. The enactment of § 9–114 under chapter 251 in 1982 further evidences the Legislature's intent to ameliorate owner liability. This new section indicates that the burden for negligent paying will no longer be borne by the owner. Section 9–114 states:

> "(a) At the time of settlement or payment in full between a contractor and an owner, the contractor shall give to the owner a signed release of lien from each material supplier and subcontractor who provided work or materials under the contract.

> "(b) An owner is not subject to a lien and is not otherwise liable for any work or materials included in the release under subsection (a) of this section."

This provision shifts responsibility for insuring that subcontractors are paid away from the owner to the prime contractor.

### —Manifest Fairness—

Appellant asserts that unless we determine that appellees are "indebted" and a lien can be established, the subcontractor is unprotected from the impecunious prime contractor who breaches and then otherwise uses the payment rather than paying the portion due over to the subcontractor. Were we to accept appellant's interpretation that an unenforceable obligation amounted to "indebtedness" under the contract, owners would still be liable to subcontractors despite the fact that they have paid over all monies they were obligated to pay under the contract, and despite the fact that the prime contractor could not go back against them for the retainage. This interpretation does not limit the owner's liability but instead extends it.

Moreover, the subcontractor can best bear the risk of loss in this type of situation. One who is in the trade is clearly

in a better position than an owner to know whether the contractor is in a financially unstable position. Late payments to other materialmen and rumors in the trade are better known to the subcontractor or are more easily discoverable by the subcontractor than the homeowner. Increasing the risk of double payment for the single family dwelling owner may well dampen the enthusiasm of the prospective house builder. This in turn would further decrease housing starts, particularly in a slow market.[5]

Additionally, the subcontractor can protect itself against loss very easily under the contract. The standard A.I.A. contract used in the case *sub judice* provided that the "[o]wner shall have the right to issue joint payee checks to Contractor and such other subcontractors or materialmen as Owner may deem necessary in Owner's sole discretion." Appellant, if it anticipated trouble or suspected the contractor of financial instability or as a preventive measure, could have requested the owner to issue progress checks payable to both the prime contractor and to it for the work it did. Single family dwelling owners have little reason to object when a subcontractor requests that it be named as a joint payee for work done since such a request forestalls the possibility of a mechanic's lien levied against their property. Thus, despite appellant's protestations, it is not necessarily unprotected from the impecunious contractor. Moreover, the unpaid subcontractor may always file suit against the prime contractor to recover monies due for work performed. Section 9–111, in force prior to 1982 and still in effect, contemplates such a situation by providing that

"[n]othing in this subtitle affects the right of any person, to whom any debt is due for work done or material furnished, to maintain any personal action against the

---

**5.** For those unfamiliar with the housing industry, the number of housing starts is used as a predictor for market conditions for the coming year.

owner of the building or any other person liable for the debt." [6]

## UNJUST ENRICHMENT

Finally, contrary to appellant's characterization, appellees were not unjustly enriched based on the facts presented. It is appropriate to infer that appellees paid to the contractor in the last progress payment the amount allocable to appellant for the work it performed less 20 percent. Appellees would be required to pay twice for the work done should they have to pay appellant now or should a lien in the full amount be established.[7]

Moreover, although the exact purpose of the retainage is not specified in the contract, it has generally been said that one purpose behind the retainage is for the owner to have a source of funds "to complete the job if the contractor should default." *Construction and Design Law,* Progress Payments § 17.4b.3. (1986). Appellees testified that they used the retainage to complete construction of the house. The uncontroverted evidence presented was that at the time of Hunter's breach, slightly less than $75,000 had been paid on account of the $125,000 contract price. Appellees stated that it cost them over $90,000 more to complete the building substantially in compliance with the original contract.[8] It cost appellees approximately $40,000 more to complete their house than the amount called for under the original contract price.

---

**6.** We recognize that this right is of little consolation when the contractor is insolvent. This same dilemma applies with equal force to the homeowner.

**7.** Although appellees withheld 20 percent of the funds allocable to the work performed by appellants, as we stated, Hunter does not have an enforceable debt for those funds and thus appellee cannot even establish a lien for 20 percent of the work it performed.

**8.** Actually appellee testified some additional work as provided for in the contract was not yet done, but presented no evidence as to the additional amount needed.

In conclusion, we hold the owners were not indebted under the contract when the notice of intent to claim a lien was given, nor were they unjustly enriched. Hence, the subcontractor's lien must fail.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.