783 A.2d 691

**RIDGE HEATING, AIR CONDITIONING AND PLUMBING, INC.,**

v.

**Robert S. BRENNEN, et ux.**

**No. 135, Sept. Term, 2000.**

Court of Appeals of Maryland.

Oct. 19, 2001.

Anthony J. DiPaula (DiPaula & Sullivan, LLC, on brief) of Bel Air, for petitioner.

J. Mitchell Kearney (Brown, Diffenderffer & Kearney, LLP, on brief) of Baltimore, for respondents.

Argued before BELL, C.J., and ELDRIDGE, RAKER, WILNER, CATHELL, HARRELL, and BATTAGLIA, JJ.

RAKER, Judge.

The question in this case is whether a subcontractor who works on an addition to an existing home can impose a mechanic's lien on the home when the homeowner has already paid the general contractor for the subcontractor's services.

The Circuit Court for Baltimore County granted summary judgment to respondents, Robert and Elizabeth Brennen, based on Maryland Code (1974, 1999 Repl.Vol., 2001 Supp.) § 9–104(f)(3) of the Real Property Article, which limits the right of a subcontractor to obtain a mechanic's lien on a single family dwelling.[1]  The Court of Special Appeals affirmed. *Ridge Heating, Air Conditioning & Plumbing, Inc. v. Brennen,* 135 Md.App. 247, 762 A.2d 161 (2000).  We shall hold that § 9–104(f)(3) applies to improved homes as well as new homes and therefore affirm.

In December 1997, Ridge Heating, Air Conditioning, and Plumbing, Inc. ("Ridge"), a subcontractor, contracted with Timberwood Construction, Inc. ("Timberwood"), a general contractor, to provide and install heating, air conditioning and plumbing for an addition to the home of Mr. and Mrs. Brennen (the "Brennens").  Ridge's contract was pursuant to a general contract that required Timberwood to complete construction on the addition to the Brennens' home by April 25, 1998, and the Brennens to pay progress payments totaling $153,085.

Due to financial difficulties, Timberwood abandoned the project on August 3, 1998, breaching its contracts with the Brennens and Ridge.  The Brennens found another contractor to finish the job at an additional cost.  After the breach, the Brennens were not indebted to Timberwood for any of the work done prior to the breach, including the labor and materials supplied by Ridge.  Ridge, however, had not been paid by Timberwood, and on September 30, 1998, Ridge filed a two-count Complaint to Establish and Enforce a Mechanic's Lien against the Brennens in the Circuit Court for Baltimore County.  On October 5, 1998, the Circuit Court issued an Order to Show Cause, commanding the Brennens to show cause why the lien should not attach to their property.  The Brennens filed a Verified Answer on October 22, 1998, denying

---

1.  Unless otherwise noted, all statutory references are to Maryland Code (1974, 1998 Repl.Vol., 2001 Supp.), Real Property Article.

liability on the grounds that they were not indebted to Timberwood.

At the show cause hearing on November 12, 1998, the parties agreed, by Consent Order, that the matter should be set for trial in the normal course and that no final lien would be entered at that stage of the proceedings. Following discovery, the Brennens filed a Motion for Summary Judgment on May 9, 1999. On December 29, 1999, Judge Robert E. Cadigan granted summary judgment in favor of the Brennens on the basis that § 9–104(f)(3) applied to the Brennens' home and that Ridge failed to show that the Brennens were indebted to Timberwood.

Ridge noted a timely appeal to the Court of Special Appeals, presenting the following question:

"Did the trial court err in applying Real Property § 9–104(f)(3) of the Maryland Annotated Code, limiting an owner's liability to a subcontractor who performs work on the owner's single family dwelling?"

The Court of Special Appeals affirmed the judgment of the Circuit Court on three grounds: (1) that the Court of Special Appeals' decisions and the decisions of this Court have consistently construed § 9–104(f)(3) in favor of homeowners; (2) that, in crafting § 9–104(f)(3), the Legislature did not intend to distinguish between new and existing homes; and (3) that Ridge bore the risk of breach by Timberwood because, as a subcontractor, Ridge was in a better position to know the general contractor's financial condition.

We granted Ridge's petition for writ of certiorari to consider the issue of whether § 9–104(f)(3) applies to an addition to an existing single family dwelling. *Ridge Heating v. Brennen*, 362 Md. 624, 766 A.2d 147 (2001).

■ Before delving into the meaning of the statutory language of § 9–104(f)(3), it is helpful to understand the structure of Maryland's mechanic's lien law. In *Winkler Const. Co., v. Jerome*, 355 Md. 231, 734 A.2d 212 (1999), we explained how the mechanic's lien law protects subcontractors:

"Maryland Code, § 9–102 of the Real Property Article provides, in relevant part, that every building that is either newly erected or repaired to the extent of 15% of its value is subject to a lien—a mechanic's lien—for the payment of all debts contracted for work done and materials supplied for or about the building. That includes debts owing to subcontractors who have no privity with the owner of the property and whom the owner may not even know worked on or supplied materials for the building."

*Id.* at 235, 734 A.2d at 214–15. We also found that the mechanic's lien law historically has been construed in the most liberal and comprehensive manner in favor of mechanics and materialmen. *Id.* at 246, 734 A.2d at 221 (quoting *T. Dan Kolker, Inc. v. Shure*, 209 Md. 290, 296, 121 A.2d 223, 226 (1956)). This liberal construction is essential to subcontractors, who enhance the value of the homeowner's property but have no direct contractual relationship with the owner and therefore cannot otherwise subject the owner's property or assets to a mechanic's lien. *Id.*

■ In 1982, Chapter 251 of the Real Property Article, also known as the "residential exception," was enacted. In contrast to the general purpose of the mechanic's lien law, discussed above, the goal of the residential exception is:

"to 'limit[ ] the liability of an owner to a subcontractor for work performed and materials rendered by the subcontractor on a single family dwelling erected on the owner's land for his own residence, to the extent that the owner has rendered payment to the contractor.' The expressed intent of the Legislature was clearly remedial, but remedial, in this instance, in favor of the owner, rather than the claimant. The ability under the existing law of an owner, upon receipt of a subcontractor's notice, to withhold the amount of the claim from the prime contractor was obviously not regarded as sufficient protection in the case of a single family residence being built for the owner's own residential use. By the time the notice is received, the owner may already have paid the prime contractor or have accumulated set-offs or credits exceeding what is owed on the contract."

*Winkler Const.,* 355 Md. at 248, 734 A.2d at 222. The statute we are here concerned with, Real Property § 9–104(f)(3), is part of Chapter 251 and reads as follows:

"(f) Payments by owner to contractor after notice, limitation on lien against certain single family dwellings.—

\* \* \*

(3) Notwithstanding any other provision of this section to the contrary, the lien of the subcontractor against a single family dwelling being erected on the land of the owner for his own residence shall not exceed the amount by which the owner is indebted under the contract at the time the notice is given."

Ridge argues that, although the Brennens have paid for the work done on their home, § 9–104(f)(3) does not protect them against a lien because the phrase "dwelling being erected" means new homes, not homes repaired, rebuilt or improved. Ridge's argument is based on the statutory language, case law, and policy.

In interpreting § 9–104(f)(3), Ridge relies heavily on other sections of the residential exception that refer to "buildings erected" and buildings "repaired, rebuilt, or improved." For example, § 9–102(a) reads as follows:

"Every building erected and every building repaired, rebuilt or improved to the extent of 15 percent of its value is subject to establishment of a lien in accordance with this subtitle for the payment of all debts, without regard to the amount, contracted for work done for or about the building and for materials furnished for or about the building, including . . . ."

According to Ridge, the opening sentence of § 9–102(a) clearly differentiates between a building erected, meaning a newly-constructed home, and every building repaired, rebuilt or improved. It follows, Ridge reasons, that, if the Legislature intended § 9–104(f)(3) to apply to new and existing homes, it would have said as much, as it did in § 9–102(a).

As for case law, Ridge correctly observes that no Maryland court has considered the meaning of the phrase

"being erected." Nevertheless, Ridge draws three points from a single case, *Ridge Sheet Metal Co., Inc. v. Morrell,* 69 Md.App. 364, 517 A.2d 1133 (1986). Ridge argues that: (1) although a significant change occurred in the mechanic's lien law in 1982, it is still to be interpreted in favor of mechanics and suppliers; (2) the Legislature intended to limit the protection of § 9–104(f)(3) to owners of new homes; and (3) the residential exception was designed to jumpstart the housing market during an economic downturn by protecting owners of new homes from mechanics' liens.

We do not find Ridge's arguments persuasive. The statutory language is anything but clear as to the distinction between new and improved homes. The phrase "being erected" may reasonably be applied to many types of construction, including new homes, an addition to an existing home, or a home erected on an existing foundation after a disaster such as a fire. In *Tucker v. Fireman's Fund Insurance Co.,* 308 Md. 69, 517 A.2d 730 (1986), we recognized the rule that:

> [W]here a statute is plainly susceptible of more than one meaning and thus contains an ambiguity, courts consider not only the literal or usual meaning of the words, but their meaning and effect in light of the setting, the objectives and purpose of the enactment. In such circumstances, the court, in seeking to ascertain legislative intent, may consider the consequences resulting from one meaning rather than another, and adopt that construction which avoids an illogical or unreasonable result, or one which is inconsistent with common sense.

*Id.* at 75, 517 A.2d at 732–33 (citations omitted).

The Legislature has not indicated, nor has any court suggested, that other sections of the statute draw the distinction Ridge seeks. We find that, in enacting § 9–102(a), the Legislature likely intended to establish that, for the purposes of the mechanic's lien laws, a building that is "erected" is the equivalent to one that is "repaired, rebuilt, or improved to the extent of 15% of its value." The crucial distinction is between homes improved to the extent of 15% of their value and homes

improved to less than 15% of their value, not merely between new and improved homes.

The holdings of this Court and the courts below reinforce our reading of the Legislature's intent. The language of *Ridge Sheet Metal Co., Inc. v. Morrell,* 69 Md.App. 364, 517 A.2d 1133, cited by Ridge for the proposition that the Legislature intended to limit § 9–104(f)(3) to construction of new homes, reads as follows:

> "Turning to the legislative intent, we glean from the preamble to chapter 251 quoted previously that the Legislature intended in *limited* situations to shift the risk of loss from the owner of a single family dwelling to the subcontractor. The enactment of § 9–114 under chapter 251 in 1982 further evidences the Legislature's intent to ameliorate owner liability."

*Id.* at 374, 517 A.2d at 1138 (emphasis added). At no point does the Court of Special Appeals state or imply that "limited situations" means only those situations where a homeowner builds a new home. Moreover, the relevant case law has evolved since *Ridge Sheet Metal. See Winkler Const. Co., v. Jerome,* 355 Md. 231, 734 A.2d 212 (1999); *Reisterstown Lumber Co. v. Tsao,* 319 Md. 623, 574 A.2d 307 (1990); *Best Drywall, Inc. v. Berry,* 108 Md.App. 381, 672 A.2d 116 (1996); *F. Scott Jay & Co., Inc. v. Vargo,* 112 Md.App. 354, 685 A.2d 799 (1996); *Grubb Contractors v. Abbott,* 84 Md.App. 384, 579 A.2d 1185 (1990).

Generally, courts have hesitated to construe the statute against homeowners. For example, in *Best Drywall, Inc. v. Berry,* the court decided whether a vacation home is a single family dwelling being erected on the land of the owner for his own residence within the meaning of § 9–104(f)(3). *Best Drywall,* 108 Md.App. at 383, 672 A.2d at 117. In so doing, the court applied from *Grubb Contractors* and *Ridge Sheet Metal* the principle that,

> "contrary to the general purpose of the overall mechanic's lien statute to protect subcontractors and materialmen, § 9–104(f)(3) clearly has as its purpose an intent to shift respon-

sibility for insuring payment of a subcontractor from the owner of the dwelling to the prime contractor, i.e., to limit the subcontractor's ability to lien the single family residence. Consistent with the reasoning in *Ridge Sheet Metal* that the subcontractor's broad reading of "indebted" in § 9–104(f)(3) was inimicable [sic] to the intended limiting effect of that particular section of the statute, we conclude here that Best Drywall is better able than appellees to bear the risk of loss in this type of situation also."

*Id.* at 394, 672 A.2d at 123.

This Court has dealt with § 9–104(f)(3) twice since *Ridge Sheet Metal.* In *Reisterstown Lumber Co. v. Tsao,* 319 Md. 623, 574 A.2d 307 (1990), we held that whether a new home is intended as the owner's "own residence" is determined as of the time when the subcontractor commences work. *Id.* at 631, 574 A.2d at 311. We reasoned that, by using the phrase "own residence," the General Assembly surely did not intend to put on the lien claimant the burden of proving that throughout the entire course of construction the owner of the home intended to make it his "own residence." *Id.* Later, in *Winkler Const. Co., Inc. v. Jerome,* 355 Md. 231, 734 A.2d 212 (1999), we held that § 9–104(f)(3) does not require the lien claimant to aver in the complaint whether, at the time the subcontractor's notice was sent, the owner had paid the prime contractor in full. *Id.* at 253, 734 A.2d at 224. The basis for this holding was the same as in *Reisterstown:* "that the mechanic's lien law should not be construed in such a way as to make the burden on the claimant so difficult as effectively to withdraw the remedy that the Legislature has clearly provided." *Id.* at 252, 734 A.2d at 224.

■ *Reisterstown* and *Winkler* are not controlling in that they concern the burdens borne by a lien claimant, whereas here we are concerned with a phrase that governs the applicability of the statute. Nevertheless, we may still draw two lessons from *Reisterstown* and *Winkler:* in interpreting § 9–104(f)(3), we seek rules that can be applied with "relative simplicity," *Reisterstown,* 319 Md. at 631, 574 A.2d at 311, and

that strike a fair and reasonable balance of the competing interests of homeowners and subcontractors. *Winkler,* 355 Md. at 254, 734 A.2d at 225.

There is no support for the claim that the Legislature, in attempting to encourage construction, favored construction of new homes over improvements. In *Ridge Sheet Metal,* the Court of Special Appeals reasoned that "[i]ncreasing the risk of double payment for the single family dwelling owner may well dampen the enthusiasm of the prospective house builder." 69 Md.App. at 375, 517 A.2d at 1138. This analysis, however, was part of the court's discussion of "manifest fairness," not legislative intent. Moreover, if Ridge's view were adopted, a family that has paid for building a new home on a vacant lot would not be subject to a subcontractor's lien, while a family such as the Brennens, having spent the same amount of money, will be in danger of losing their home through foreclosure on a mechanic's lien. Creating a risk of double payment for homeowners considering expensive improvements surely will not benefit the construction industry, which profits from improving homes. Because the Legislature has given us no indication that it wanted to encourage only one type of construction, we cannot ascribe to it an intent that would impede rather than encourage construction.

In light of the foregoing, we hold that § 9–104(f)(3) applies to an addition to an existing home. We see no basis in the statutory language or case law for reading the phrase "being erected" so that a the owner of a new home is protected from double payment while the owner of a improved home is not. In keeping with *Reisterstown* and *Winkler,* our reading allows for simple and efficient application of § 9–104(f)(3). Finally, favoring owners of new homes over owners of improved homes is inconsistent with the one policy rationale Ridge has supplied: encouraging new construction. Assuming Ridge is correct that the Legislature hoped to increase construction, then, absent evidence of contrary legislative intent, § 9–104(f)(3) should be interpreted to foster construction on new *and* existing homes.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; COSTS TO BE PAID BY PETITIONERS.*

Dissenting Opinion by BELL, C.J., in which WILNER, J. joins.

We granted certiorari, *Ridge Heating v. Brennen,* 362 Md. 624, 766 A.2d 147 (2001), to consider whether Maryland Code (1974, 1999 Repl.Vol.) § 9–104(f)(3) of the Real Property Article,[1] applies to homes that are merely repaired or improved and not simply to those new homes that are "being erected." A divided panel of the Court of Special Appeals construed the statute to apply to the former, 135 Md.App. 247, 258, 762 A.2d 161, 167 (2000), and the majority affirms that judgment. 366 Md. 342, 343, 783 A.2d 695 (2001). I do not agree and, because I conclude from § 9–104(f)(3)'s clear and unambiguous language that it has application only with respect to new homes, *i.e.* single family dwellings "being erected," I respectfully dissent. Accordingly, I would reverse the judgment of the intermediate appellate court.

Historically, the mechanic's lien law, remedial legislation, see § 9–112, has been construed "in the most liberal and comprehensive manner in favor of mechanics and materialmen." *T. Dan Kolker, Inc. v. Shure,* 209 Md. 290, 296, 121 A.2d 223, 226 (1956); *see generally Winkler Constr. Co. v. Jerome,* 355 Md. 231, 734 A.2d 212 (1999) (discussing the historical development of the mechanic's lien laws). Notwithstanding our decision in *Barry Properties v. Fick Bros.,* 277 Md. 15, 19, 353 A.2d 222, 226 (1976) (holding unconstitutional provisions of the then-existing mechanic's lien law on the basis that they deprived owners of procedural due process), and subsequent amendments that were remedial in favor of homeowners, *see, e.g.,* 1982 Md. Laws, ch. 251,[2] and designed to

---

1. Unless otherwise specified, all statutory references are to the Real Property Article.

2. The Legislative intent in enacting Chapter 251 was to "limit[ ] the liability of an owner to a subcontractor for work performed and materials rendered by the subcontractor on a single family dwelling

afford a greater measure of due process to homeowners, liberal construction of the mechanic's lien laws in favor of mechanics continues to be appropriate. This is so because "[t]he need for a liberal construction is particularly important with respect to subcontractors who, though benefitting the owner and enhancing the value of the owner's property by the provision of their labor or materials, have no direct contractual relationship with the owner and therefore cannot otherwise subject the owner's property or assets to the payment of their claims." *Winkler, supra*, 355 Md. at 246, 734 A.2d at 221. Where some provisions were intended to benefit the home-owner, while the statute in general is intended to benefit mechanics and materialmen, courts must interpret the provision at issue, in the context of the entire statute, in "a sensible manner" that "provides a fair and reasonable balance to the competing interests," *id.* at 253, 734 A.2d at 225, so as to give "full force to [the provisions designed to protect homeowners] without unduly crippling a subcontractor's ability to obtain a lien." *Id.* at 255, 734 A.2d at 225.

Section 9–104(f)(3), as we have seen, was added to the Real Property Article in 1982 as a part of the "residential exception" to the mechanic's lien law. It provides:

(f) Payments by owner to contractor after notice; limitation on lien against certain single family dwellings.—

\* \* \*

---

erected on the owner's land for his own residence, to the extent that the owner has rendered payment to the contractor." As reported in *Winkler, supra*, 355 Md. 231, 249, 734 A.2d 212, 222 (1999),

The Legislature chose to achieve its intended result in three ways, all of which fit together: (1) by amending § 9–104(a) to add as a condition to a subcontractor's entitlement to a lien for work or materials supplied in such a circumstance that the owner not have made full payment to the contractor prior to receiving the notice; (2) by adding § 9–104(f)(3), to provide that a lien may not exceed the amount of the owner's indebtedness to the prime contractor at the time the subcontractor's notice is given; and (3) by adding a new § 9–114, requiring that the prime contractor, at the time of settlement with or payment in full by the owner, give the owner a signed release from each material supplier and subcontractor who provided materials under the contract.

(3) Notwithstanding any other provision of this section to the contrary, the lien of the subcontractor against a single family dwelling *being erected* on the land of the owner for his own residence shall not exceed the amount by which the owner is indebted under the contract at the time notice is given. (emphasis supplied)

Thus, § 9–104(f)(3) limits a homeowner's liability to a subcontractor to the amount of the homeowner's indebtedness to the prime contractor at the time the subcontractor's notice of intention to file a mechanic's lien is given.

The majority in the Court of Special Appeals broadly construed § 9–104(f)(3) so as to prevent a subcontractor from establishing a mechanic's lien against the owner of an existing single family home who has contracted to have that home remodeled or repaired, reasoning that such a construction is consistent with the 1982 amendment to the mechanic's lien law and its stated rationale, which it characterized as being "to protect the family and limit exposure of personal residences as opposed to commercial enterprises, to avoid subjecting homeowners to liability for double payment, and to shift the risk of loss from the homeowner to the subcontractor, who is in a better position to protect itself by requiring that the owner agree to authorize the progress draw payable to both prime and subcontractor." 135 Md.App. at 259–60, 762 A.2d at 167. It concluded that the language, "being erected on the land of the owner for his own residence," was intended merely to make clear that § 9–104(f)(3)'s limitation on liability does not extend to commercial builders. *Id.* at 259, 762 A.2d at 167. Noting the dissent's observation, "Obviously, the legislature understands how to eliminate any linguistic distinctions between new and existing construction . . .," *id.* at 259, 762 A.2d at 167, the majority opined:

[D]ivining an intent to distinguish between new construction and 'erection' of an addition to an existing structure is less plausible than the difference between home improvements, remodeling, and repairs as contradistinguished from new construction and building on an addition. Significantly, the legislature could have expressly excluded additions 'erected'

or self-contained units added to existing improvements 'erected on the land of the owner for his [or her] own residence' had that been the intent underlying the enactment of the legislation.

*Id.*

The majority in this Court agrees with that result. Characterizing the phrase, "being erected," as "anything but clear," it being reasonable, they assert, to apply it "to many types of construction, including new homes, an addition to an existing home, or a home erected on an existing foundation after a disaster such as a fire," 366 Md. at 342, 783 A.2d at 694, and noting its belief that, "in enacting § 9–102(a), the Legislature likely intended to establish that, for the purposes of the mechanic's lien laws, a building that is 'erected' is the equivalent to one that is either 'repaired, rebuilt, or improved to the extent of 15% of its value,'" *id.* at 342–343, 783 A.2d at 694, the majority draws a distinction "between homes improved to the extent of 15% of their value and homes improved to less than 15% of their value, not merely between new and improved homes." *Id.* It also relies on the holdings of this Court, *see Winkler, supra; Reisterstown Lumber Co. v. Tsao,* 319 Md. 623, 574 A.2d 307 (1990), and of the Court of Special Appeals, *see Best Drywall, Inc. v. Berry,* 108 Md.App. 381, 672 A.2d 116 (1996); *F. Scott Jay & Co., Inc. v. Vargo,* 112 Md.App. 354, 685 A.2d 799 (1996); *Grubb Contractors v. Abbott,* 84 Md.App. 384, 579 A.2d 1185 (1990), to confirm its interpretation of the legislative intent.

The position of the intermediate appellate court and of the majority of this Court is inconsistent with the plain meaning of the statutory language as well as other applicable canons of statutory construction.

The cardinal rule of statutory interpretation is to ascertain and to give effect to the intent of the Legislature. *See Mayor and City Council of Baltimore v. Chase,* 360 Md. 121, 128, 756 A.2d 987, 991 (2000); *see also Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423, 429 (1995); *Montgomery County v. Buckman,* 333 Md. 516, 523, 636 A.2d 448, 451, (1994); *Condon v. State,* 332 Md. 481, 491, 632 A.2d 753, 755 (1993). The primary

source for determining legislative intention is the language of the statute. *See Marriott Employees Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 444–45, 697 A.2d 455, 458 (1997). To this end, we begin our inquiry with the words of the statute and, ordinarily, when the words of the statute are clear and unambiguous, according to their commonly understood meaning, that is where our inquiry concludes. *See Oaks, supra,* 339 Md. at 35, 660 A.2d at 429; *Tidewater v. Mayor of Havre de Grace,* 337 Md. 338, 344, 653 A.2d 468, 472 (1995); *Buckman, supra,* 333 Md. at 523, 636 A.2d at 451; *Condon, supra,* 332 Md. at 491, 632 A.2d at 755; *Harris v. State,* 331 Md. 137, 145–46, 626 A.2d 946, 950 (1993). Thus, if the statutory language is plain and admits of no more than one meaning, our function is to enforce it according to its terms. *See Board of License Comm'rs v. Toye,* 354 Md. 116, 122, 729 A.2d 407, 410 (1999); *Marriott Employees Fed. Credit Union, supra,* 346 Md. at 444–45, 697 A.2d 455, 458.

The words of a statute are to be given their ordinary meaning. *See Chase, supra,* 360 Md. at 126, 756 A.2d at 990; *see also Chesapeake and Potomac Telephone Co. of Maryland v. Director of Finance for Mayor and City Council of Baltimore,* 343 Md. 567, 578, 683 A.2d 512, 517 (1996). In that regard, we have explained:

> Where the statutory language is plain and unambiguous, a court may neither add nor delete language so as to 'reflect an intent not evidenced in that language,' *Condon, supra,* 332 Md. at 491, 632 A.2d at 755, nor may it construe the statute with "forced or subtle interpretations that limit or extend its application." *Id.* (quoting *Tucker v. Fireman's Fund Insurance Co.,* 308 Md. 69, 73, 517 A.2d 730, 732 (1986)). Moreover, whenever possible, a statute should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory. *Buckman, supra,* 333 Md. at 524, 636 A.2d at 452; *Condon, supra,* 332 Md. at 491, 632 A.2d at 755.

*Chesapeake, supra,* 343 Md. at 578, 683 A.2d at 517.

We have acknowledged that, in determining a statute's meaning, courts may consider the context in which a statute

appears, including related statutes and legislative history. *See Morris v. Prince George's County,* 319 Md. 597, 604, 573 A.2d 1346, 1349 (1990); *see also Kaczorowski v. Baltimore,* 309 Md. 505, 515, 525 A.2d 628, 632 (1987). We have cautioned, however, that this inquiry is "in the interest of completeness," *Harris, supra,* 331 Md. at 146, 626 A.2d at 950, "to look at the purpose of the statute and compare the result obtained by use of its plain language with that which results when the purpose of the statute is taken into account." *Id.* "In other words," we emphasized in *Chase,* "the resort to legislative history is a confirmatory process; it is not undertaken to contradict the plain meaning of the statute." *Chase, supra,* 360 Md. at 131, 756 A.2d at 993; *see also Coleman v. State,* 281 Md. 538, 546, 380 A.2d 49, 54 (1977) ("a court may not as a general rule surmise a legislative intention contrary to the plain language of a statute or insert exceptions not made by the legislature."). Additionally, "[l]iberal interpretation is a rule of construction. Like other rules of construction, its purpose is to construe an ambiguous statute, not to rewrite a clear one." *Chesapeake Amusements, Inc. v. Riddle,* 363 Md. 16, 32, 766 A.2d 1036, 1046 (2001); *see also Baltimore v. Cassidy,* 338 Md. 88, 97, 656 A.2d 757, 761 (1995) ("Although we acknowledge that Maryland's [Workers' Compensation] Act 'should be construed as liberally in favor of injured employees as its provisions will permit in order to effectuate its benevolent purposes [and that] any uncertainty should be construed in favor of the claimant . . . ,' we 'may not disregard the plain meaning of the Act in the name of liberal construction . . . .' ").

We have further instructed:

Where the statute to be construed is a part of a statutory scheme, the legislative intention is not determined from that statute alone, rather it is to be discerned by considering it in light of the statutory scheme. *State v. Crescent Cities Jaycees Foundation,* 330 Md. 460, 468, 624 A.2d 955, 959. When, in that scheme, two statutes, enacted at different times and not referring to each other, *Farmers & Merchants Bank v. Schlossberg,* 306 Md. 48, 56, 507 A.2d 172,

176 (1986); *Management Personnel Serv. v. Sandefur,* 300 Md. 332, 341, 478 A.2d 310, 314 (1984), address the same subject, they must be read together, *State v. Bricker,* 321 Md. 86, 93, 581 A.2d 9, 12 (1990), i.e., interpreted with reference to one another, *Schlossberg,* 306 Md. at 61, 507 A.2d at 178; *Bridges v. Nicely,* 304 Md. 1, 10, 497 A.2d 142, 146 (1985), and harmonized, to the extent possible, both with each other and with other provisions of the statutory scheme. *Balto. Gas & Elec. v. Public Serv. Commission,* 305 Md. at 157, 501 A.2d at 1313. Neither statute should be read, however, so as to render the other, or any portion of it, meaningless, surplusage, superfluous or nugatory. *Tracey v. Tracey,* 328 Md. 380, 387, 614 A.2d 590, 594 (1992); *D & Y, Inc. v. Winston,* 320 Md. 534, 538, 578 A.2d 1177, 1179 (1990); *Kindley v. Governor of Md.,* 289 Md. 620, 625, 426 A.2d 908, 912 (1981); *Moberly v. Herboldsheimer,* 276 Md. 211, 217, 345 A.2d 855, 858 (1975). In attempting to harmonize them, we presume that, when the Legislature enacted the later of the two statutes, it was aware of the one earlier enacted. *Cicoria v. State,* 332 Md. 21, 43, 629 A.2d 742, 752 (1993); *Bricker,* 321 Md. at 93, 581 A.2d at 12.

*GEICO v. Insurance Com'r,* 332 Md. 124, 132–33, 630 A.2d 713, 717–18 (1993).

The critical question to be resolved in this case is whether § 9–104(f)(3) applies to both newly constructed single family homes and existing single family homes that are being repaired or improved. The answer to this question lies in the interpretation of the phrase "dwelling being erected." As the petitioner correctly points out, the Legislature has not defined the phrase and, although § 9–104(f)(3) previously has been before the Court on other issues, this Court has not interpreted it. The petitioner maintains that the ᾿phrase, "dwelling being erected," and thus § 9–104(f)(3), is clear and unambiguous, the plain meaning of which limits its application to new homes. Support for its interpretation lies, the petitioner submits, in those other sections of the mechanic's lien law that distinguish between buildings being erected and those that are

repaired, rebuilt, or improved.   See, for example, § 9–102(a),[3] which, as relevant provides:

> Every building erected and every building repaired, rebuilt or improved to the extent of 15 percent of its value is subject to establishment of a lien in accordance with this subtitle for the payment of all debts, without regard to the amount, contracted for work done for or about the building and for materials furnished for or about the building....

I agree with the petitioner, § 9–104(f)(3) is clear and unambiguous and, giving the phrase "dwelling being erected" its plain and ordinary meaning, has application only to new homes.   "Being" is the present participle of the verb "to be." A "present participle" is an expression "used to express

---

**3.** In addition to § 9–102(a), Judge Kenney, dissenting in the Court of Special Appeals, relied on § 9–102(c) and (d), § 9–104(a)(1) and (2) and § 9–113.   *Ridge Heating v. Brennen,* 135 Md.App. 247, 261—67, 762 A.2d 161, 168—72 (2000).   Sections 9–102(c) and (d) provide:

(c)Machines, wharves, and bridges.—Any machine, wharf, or bridge erected, constructed, or repaired within the State may be subjected to a lien in the same manner as a building is subjected to a lien in accordance with this subtitle.

(d) Exemptions.—However, a building or the land on which the building is erected may not be subjected to a lien under this subtitle if, prior to the establishment of a lien in accordance with this subtitle, legal title has been granted to a bona fide purchaser for value.

Sections 9–104(a)(1) and (2) provide:

(a) Notice required to entitle subcontractor to lien.-(1)  A subcontractor doing work or furnishing materials or both for or about a building other than a single family dwelling being erected on the owner's land for his own residence is not entitled to a lien under this subtitle unless, within 120 days after doing the work or furnishing the materials, the subcontractor gives written notice of an intention to claim a lien substantially in the form specified in subsection (b) of this section.

(2) A subcontractor doing work or furnishing materials or both for or about a single family dwelling being erected on the owner's land for his own residence is not entitled to a lien under this subtitle unless, within 120 days after doing work or furnishing materials for or about that single family dwelling, the subcontractor gives written notice of an intention to claim a lien in accordance with subsection (a)(1) of this section and the owner has not made full payment to the contractor prior to receiving the notice.

In §§ 9–113(a) and (b), the Legislature referred to "construction, alteration, or repair of a building, structure, or improvement."

present action in relation to the time indicated by the finite verb in its clause, to form progressive tenses with the auxiliary 'be,' and to function as a verbal adjective." *The American Heritage College Dictionary* 1082 (3rd ed.1997). "To erect," simply put, means to construct or establish. *Black's Law Dictionary* 562 (7th ed.1999); *see also The American Heritage College Dictionary* 465 (3rd ed.1997). Taken together, the import of the words "dwelling being erected" can only be to limit § 9–104(f)(3)'s application to dwellings that are in the process of being constructed—in other words, to new homes.

As we have seen, the majority concludes that § 9–104(f)(3) is ambiguous. To so conclude does not make it so. To be sure, the particular wording of a statute or the context in which the words are used may render a statute ambiguous. *See Gardner v. State,* 344 Md. 642, 647–48, 689 A.2d 610 (1997). Moreover, that a term may be free from ambiguity when used in one context but of doubtful application in another context is well settled. *See Truck Ins. Exch. v. Marks Rentals,* 288 Md. 428, 433, 418 A.2d 1187 (1980). Nevertheless, there is nothing ambiguous about the phrase, "dwelling being erected," or the context in which it is being used. "Erect," as pointed out, has a definite meaning-to construct or establish. "Construct," in turn, means "the act of building by combining or arranging parts or elements," *Black's Law Dictionary* 308 (7th ed.1999); *see also The American Heritage College Dictionary* 299 (3rd ed.1997), and "establish" means "to set up." *See Black's Law Dictionary* 308 (7th ed.1999); *see also The American Heritage College Dictionary* 469 (3rd ed.1997). On the other hand, "repair," *see The American Heritage College Dictionary* 1156 (3rd ed.1997) ("to restore to sound condition after damage or injury; fix"), "rebuild," *see id.* at 1139, 418 A.2d 1187 ("to build again"), and "improve," *see id.* at 684, 418 A.2d 1187 ("to raise to a more desirable or more excellent quality or condition; make better"), have different meanings, each relating to work done on an existing structure. It follows that referring to a building being erected has a vastly different meaning than a reference to one being repaired, rebuilt, or improved.

Nor does the context suggest otherwise. Indeed, reference to the statutory context produces the opposite result; rather than making the meaning of the phrase "dwelling being erected" ambiguous, the Legislature's recognition, in § 9–102(a), of the distinction between new construction, characterized by the phrase "building being erected," and work on existing buildings, characterized by reference to "building repaired, rebuilt or improved" actually clarifies its meaning. The statutory context, in other words, demonstrates that the Legislature knew how to, and did, define precisely the reach and application it intended § 9–104(f)(3) to have.

The majority's reliance on *Tucker v. Fireman's Fund Insurance Co., supra*, 308 Md. at 69, 517 A.2d at 730, is misplaced. There, the Court was required to construe "pedestrian" as used in Maryland Code (1957, 1986 Repl.Vol.) Article 48A, § 539(a). A parking lot attendant, who was sitting on a stool when he was struck by a car, sought PIP benefits pursuant to § 539(a), which included among those eligible for such benefits, "pedestrians injured in an accident in which the insured motor vehicle is involved." The ambiguity of the meaning of the word "pedestrian" was manifest in this context: Maryland Code (1984 Repl.Vol.), §§ 11–145 of the Transportation Article and *Webster's Third New International Dictionary* 1664 (1971) defined "pedestrian" as "a person afoot" and "a person who travels on foot," while the policy of § 539(b)'s legislatively mandated insurance coverage, which was "not so related to the motor vehicle laws of the State as to compel a like construction of terms used in the two statutes," *id.* at 74, 517 A.2d at 732, would be thwarted by that definition.

The majority's reading of § 9–104(f)(3) is, in any event, inconsistent with other relevant canons of statutory construction. By interpreting the phrase "dwelling being erected" to include both dwellings being constructed, *i.e.* new single family homes, *and* those being repaired or improved, the majority, in effect, adds words to § 9–104(f)(3), thus, giving it a forced interpretation, reflecting an intention not evidenced by its plain language. In the process, it dramatically extends the

section's application by precluding subcontractors from establishing mechanic's liens against any owner-occupied, single-family homes. To be sure, as the majority correctly observes, the legislative intention in enacting the "residential exception" was to protect homeowners, rather than, as evidenced in the remainder of the law, materialmen and mechanics. Nevertheless, neither the terms of the statute itself nor the legislative history provides a basis for the majority's conclusion that the Legislature intended for § 9–104(f)(3) to apply so broadly.

In fact, if the Legislature's intent was to have § 9–104(f)(3) apply to all single family homeowner occupied dwellings, it is difficult to understand why it chose to use the "being erected" language at all. If, as the intermediate appellate court suggests, see 135 Md.App. at 259, 762 A.2d at 167, the purpose of this language is merely to emphasize that the subsection only applies to homeowners, a far more sensible approach would have been for the Legislature to state simply that § 9–104(f)(3) is limited to "a single-family dwelling on the land of the owner for his own residence." Another, and perhaps the more obvious, way of phrasing the statute would have been to state explicitly, "this subsection does not apply to commercial builders." The Legislature adopted neither of these approaches. We, therefore, must presume that it had a reason for including the phrase "being erected" and give that phrase its ordinary meaning. Yet, the majority's construction of § 9–104(f)(3) impermissibly renders the phrase both superfluous and nugatory.

Section 9–102(a) also is relevant to the interpretation of § 9–104(f)(3). Because it predated the enactment of § 9–104(f)(3) and, is a part of the statutory scheme of which § 9–104(f)(3) is a part, its existence and content are presumed to have been known by the Legislature when it promulgated the later statute. GEICO, supra, 332 Md. at 132–33, 630 A.2d at 717–18. Thus, § 9–102(a) is part of the context in which § 9–104(f)(3) must be viewed. Reading the two statutes together should resolve any ambiguity the majority finds in § 9–104(f)(3), in favor of the petitioner. The distinction drawn between buildings that are "erected" and those that are

"repaired, rebuilt, or improved" in other sections of the mechanic's lien law also undermines the majority's construction.

As noted, § 9–102(a) differentiates between buildings that are erected and those that are repaired, rebuilt or improved. As Judge Kenney in the Court of Special Appeals pointed out in dissent and the petitioner now argues, having drawn that distinction in § 9–102, a part of the statutory scheme, the Legislature could not have intended that § 9–104(f)(3), which only refers to residential homes "being erected," apply to both situations. The majority attempts to explain away the Legislature's recognition, in § 9–102, of the distinction between new construction and repairs, rebuilding and improvements. It does so by surmising that, "in enacting § 9–102(a), the Legislature likely intended to establish that, for the purposes of the mechanic's lien laws, a building that is 'erected' is the equivalent to one that is either 'repaired, rebuilt, or improved to the extent of 15% of its value.' "

As it does in connection with its interpretation of § 9–104(f)(3), the majority gives § 9–102(a) a strained interpretation to reach a meaning that is not evident from, or even marginally supported by, the plain language. If, as the majority initially concludes, the phrase "being erected" reasonably includes various kinds of construction, it would have been unnecessary for the Legislature to specify in § 9–102(a) that both erected buildings *and* buildings that are substantially repaired, rebuilt, or improved are subject to establishment of a lien. In any event, the more sensible interpretation of § 9–102(a) is that by specifying that both "buildings erected" and buildings "repaired, rebuilt, or improved to the extent of 15%" of their value constitute "property subject to lien," the Legislature sought to create a statutory remedy that would protect materialmen when they are at their most vulnerable: when they are providing labor and materials in the substantial amounts required for either new home construction or major repairs and improvements.

Furthermore, although the majority holds that "the crucial distinction is between homes improved to the extent of 15% of

their value and those improved to less than 15% of their value," 366 Md. at 349, 783 A.2d at 698, it fails to apply that analysis to its construction of § 9–104(f)(3). Under such analysis, § 9–104(f)(3) only applies to an addition to an existing home if the addition exceeds 15% of that home's value. Although there is evidence of the value of the contract and thus the amount of the work to be done on the Brennen's home, there simply is no evidence as to the value of the Brennen residence.

The majority's holding that the distinction is between residences improved by more than 15 percent of their value and those that are not, while I believe it not to be a proper interpretation of the statute, is fraught with significant difficulties in its application, not the least of which is the specter of a trial within a trial as to the value of the homeowner's residence as well as the relative value of the improvements. This is not productive of a simple and efficient application of § 9–104(f)(3), the goal that the majority states will be furthered by its approach. See 366 Md. at 353–354, 783 A.2d at 701. Most certainly, a rule attaching § 9–104(f)(3)'s protection to property values and repair estimates would be substantially more cumbersome than one that simply limits the subsection's application to new homes. In addition, as I have shown, the majority's approach renders superfluous the language of § 9–102(a) distinguishing between such buildings, and ignores that the Legislature was aware of § 9–102(a) when it enacted § 9–104(f)(3) and apparently chose to limit the latter's application. Thus, examination of the statutory context of § 9–104(f)(3) does not support the majority's reading of the Legislature's intent. Rather, it only serves to confirm the plain meaning of the statutory language.

Finally, the cases on which the majority relies, *Winkler, supra; Reisterstown Lumber, supra; Best Drywall, supra; F. Scott Jay & Co., supra; Grubb, supra,* do not support its conclusion. Those cases have discussed § 9–104(f)(3), but in other contexts. The majority concludes, 366 Md. at 351, 783 A.2d at 700, that "generally, courts have hesitated to construe the statute against homeowners," *see, e.g., Reisterstown Lum-*

*ber, supra,* and point to the need for rules that are easy to apply and that strike a balance between the competing interests of homeowners and subcontractors. *See, e.g., Winkler, supra.*

In none of those cases was the meaning of the phrase "being erected" presented to the court for resolution. And, rather than being in conflict with the construction urged by the petitioner and the dissenting judge in the intermediate appellate court, the cases are consistent. In *Winkler,* the Court ruled in favor of the subcontractor, holding that § 9–104(f)(3) did not require an allegation in the complaint that, at the time notice of the lien was sent, the owner had not paid the prime contractor in full. *See Winkler, supra,* 355 Md. at 254–55, 734 A.2d at 225. Citing *Reisterstown Lumber, supra,* 319 Md. at 623, 574 A.2d at 307, the Court reasoned, "the mechanic's lien law should not be construed in such a way as to make the burden on the claimant so difficult as effectively to withdraw the remedy that the Legislature has clearly provided." *Winkler,* 355 Md. at 252, 734 A.2d at 224.

*Reisterstown Lumber,* although characterized by the majority as one of two cases in which this Court recently "dealt" with § 9–104(f)(3), technically was not a § 9–104(f)(3) case at all.[4] Rather, at issue in *Reisterstown Lumber* was whether § 9–104(a)(2), which is worded identically to § 9–104(f)(3), applies "when homeowners contract to have a single family dwelling built on their land with the intent to make it their residence, but, during the course of construction, decide to place the house on the market for sale." 319 Md. at 625, 574 A.2d at 308. The Court answered this question affirmatively, holding that "whether the improvements are 'for [the owner's] own residence' is determined as of the time when the subcon-

---

4. The Court explicitly stated: "The issue here is not how much the lien on the residence may be. Thus, the time of the notice as specified in § 9–104(f)(3) is not controlling. Rather, the issue is whether the special rule of § 9–104(a)(2) applies at all." *Reisterstown Lumber, supra,* 319 Md. at 629, 574 A.2d at 310. Nonetheless, the application of these subsections does hinge on the establishment of the same four facts. *See generally Winkler, supra,* 355 Md. at 235–36, 734 A.2d at 215.

tractor commences an otherwise substantially uninterrupted performance of work for, or selling of materials to, the contractor." *Id.* at 631, 574 A.2d at 311. It is of interest that the Court addressed the effect of making the decision turn on the homeowners intent at some later time:

> In selecting the standard, 'for [the owner's] own residence,' the General Assembly surely did not intend to put on the lien claimant the burden of demonstrating a predominant intent over the entire course of construction in order to avoid the residential exception. Indeed, it is difficult enough to establish intent at the moment of the res gestae in the prosecution of some crimes. A construction of § 9–104(a)(2) which is heavily dependent on subjective intent or on tracing, over a long period of time, the conduct of persons with whom the claimant has no privity would not allow liens to be established, or the residential exception to be applied, with relative simplicity." reasoning "the General Assembly surely did not intend to put on the lien claimant the burden of demonstrating a predominant intent over the entire course of construction in order to avoid the residential exception.

*Id.* New construction was involved in this case, as to which Judge Rodowsky commented: "The problem presented by this case is of limited scope. It arises only when an owner is having a home built on the owner's land, and there is a change of plan." *Id.* at 630, 574 A.2d at 311.

Contrary to the majority's view, these cases do not evidence a trend favoring homeowners although they do, as they must, acknowledge the purpose of the residential exception. In addition, to the extent the cases instruct courts to strike a fair and reasonable balance between the competing interests of homeowners and subcontractors, they also underscore that this balance may, on occasion, require that even the "residential exception" should be construed in favor of subcontractors.

The remaining cases on which the majority relies are simply unpersuasive. Two of them, *see Best Drywall, supra; F. Scott Jay & Co., supra,*[5] are factually distinguishable from the case

---

5. In *Winkler,* we noted our disagreement in part with the Court of Special Appeals' decision in *F. Scott Jay & Co.*

*sub judice* because they involve, as I believe § 9–104(f)(3) *requires*, newly constructed dwellings rather than existing homes being repaired or improved. Although *Grubb, supra*, involved an addition to an existing residence, as Judge Kenney pointed out in dissent, the issue presented and decided in that case was what constitutes a single family dwelling, not the application of § 9–104(f)(3) to the construction in that case. 135 Md.App. at 262, 762 A.2d at 169. In any event, *Grubb* was decided without the benefit of *Winkler*, which demonstrates that it is possible to give "full force and effect to § 9–104(a)(2) and (f)(3) without unduly crippling a subcontractor's ability to obtain a lien." *Winkler, supra* at 255, 734 A.2d at 225.

In summary, § 9–104(f)(3) clearly and unambiguously limits its application to new homes, not to existing homes that are merely repaired or improved and that interpretation is confirmed by examination of the statutory context in which it appears. I would hold that § 9–104(f)(3) neither applies to an addition to an existing home nor prevents a subcontractor from establishing a lien against such a single family home.

Judge WILNER joins in the views herein expressed.